2021 UT App 29

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SHANE PATRICK SAMORA,
Appellant.

Opinion
No. 20180983-CA
Filed March 18, 2021

Third District Court, Salt Lake Department
The Honorable Linda M. Jones
No. 171906629

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion,
in which JUDGE DAVID N. MORTENSEN and
SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1    A jury convicted Shane Patrick Samora of aggravated robbery for holding up a convenience store at knifepoint. Samora appeals that conviction, asserting that the trial court improperly admitted two categories of evidence used at trial, and that the evidence was insufficient to establish that he was the robber. We affirm.

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND[2]

¶2    Just after dusk one summer evening, a clerk (Clerk) on duty at a Chevron convenience store observed a man enter the store wearing black and white tennis shoes, black shorts, and "a pullover hoodie." Clerk and the man were the only people in the store at the time. Clerk greeted the man, and went to the register to assist him. Once Clerk arrived at the register, he looked up and noticed that the man was wearing "a mask over [his] face."[3] The man told Clerk, "This is a robbery," and instructed Clerk to "[g]ive [him] the money." Clerk initially thought the man was joking. The man repeated his demand, and Clerk responded by telling the man to "get out of [the] store." The man then took out a ten-to-twelve-inch kitchen knife, showed it to Clerk, and stated his demand for money a third time.

¶3    At this point, Clerk realized the situation was "more serious" than he initially thought, and he told the man, "[G]et out of my store or I'll call the cops. I'm not going to give you any money." The man then thrust the knife "across the counter," and pointed it "directly" at Clerk. Although Clerk was "very frightened" and "took a step back" away from the knife, he again told the man to leave and that he was "calling the cops." This time, the man left, and Clerk decided to "follow [him] out of the store."

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (quotation simplified).

3. The events in question occurred in 2017, before the onset of the COVID-19 pandemic; at that time, it was unusual to encounter people wearing masks over their faces in public places.

¶4     Once he was outside the store, still following the man, Clerk called 911 on his cell phone. While on the phone with the 911 operator, Clerk continued to trail the man, but briefly lost sight of him for about ten seconds as the man turned a corner onto the sidewalk and disappeared behind a fence. The sidewalk where the man was walking did "not [have] foot traffic" that night. Clerk continued walking in the direction he had seen the man go, and after rounding the same corner onto the same sidewalk he saw "an individual dressed in the same clothing" and with the "same height, same body build" as the robber walking in the direction the man had been walking. At this point Clerk was "30 to 40 feet" behind the man, and followed him to "a place of residence," which Clerk described as a "gray building" with a green "awning on the front of it." Clerk watched the man enter the building through a door located beneath the green awning. Clerk had remained on the phone with the 911 operator the entire time he followed the man, and he described to the operator in real time the building—including its address—that the man had just entered.

¶5     Immediately after getting off the phone with the 911 operator, Clerk returned to the store and called his manager (Manager), who was out of town on vacation, to inform her of the robbery. The convenience store was equipped with a surveillance system that recorded video but not audio, and which could be accessed remotely via a cell phone application. Upon receiving the call from Clerk, Manager—who was the only person with access to the surveillance system—immediately accessed the application on her cell phone and "watched what had happened." Manager took six screenshots of the footage of the robbery and sent them to Clerk via text message. In those screenshots, a masked man can be seen entering the store and approaching the counter, and later pointing a knife at Clerk. The man in the screenshots has a "horseshoe shape[d]" receding hairline, and is wearing white athletic shoes with crisscrossed black laces, black shorts, and a black hooded sweatshirt over a

white t-shirt. In most of the screenshots, the man has a mask over the bottom part of his face.

¶6    Police responded within five minutes, with one officer meeting Clerk at the convenience store while two others were dispatched to the gray building Clerk had seen the man enter. Upon their arrival at the building, the two officers saw a man standing in the doorway who appeared to match the description given by Clerk; the man was "wearing a white shirt with black shorts," as well as white athletic shoes with small red marks on the sides and black laces tied in a distinctive crisscross pattern. This man was Samora, and soon after "ma[king] eye contact" with one of the officers, he went inside and shut the door. The officers then approached the doorway, which turned out to lead into a residential apartment where Samora lived, and subsequently placed Samora under arrest, taking (among other things) Samora's shoes as evidence.

¶7    Meanwhile, officers took a statement from Clerk, and the investigating detective (Detective) acquired electronic copies of the six screenshots that Manager had sent to Clerk.[4] Detective then traveled to the apartment building, visually compared Samora to the man in the photos, and "felt comfortable" that Samora was the robber.

---

4. About three weeks after the robbery, Detective attempted to obtain the entire surveillance video of the incident from a computer in the store office, where footage from the surveillance system is typically stored. But Detective was unable to recover the video, apparently because the system is set to periodically and routinely delete video files unless action is taken to save them, and no one had saved the entire video before the routine deletion occurred. Accordingly, the six screenshots are the only evidence available from the video taken by the surveillance system on the night of the robbery.

¶8     Detective obtained a warrant to search Samora's apartment. While executing the search, Detective found a knife in a kitchen drawer that looked similar to the knife used in the robbery. Detective also found a "dark-colored hoodie," featuring a distinctive "chevron" pattern, hanging on a hook located on the wall "right next to the door in the entryway." Detective took the knife and the hoodie as evidence.

¶9     The State charged Samora with aggravated robbery, a first-degree felony.[5] As the case proceeded toward trial, the State recognized that two characteristics of the clothing taken from Samora and from his apartment do not appear on the person in the screenshots from the surveillance video: (1) the distinctive chevron pattern on the hoodie found in the apartment; and (2) the red marks on the sides of the otherwise-white athletic shoes Samora was wearing during his arrest. Believing that the absence of these two features in the screenshots could be due to the way the store's surveillance system captures images, Detective and a forensic examiner took the hoodie and the shoes to the store and attempted to "reconstruct" the screenshots taken of the surveillance system footage. Detective and the examiner attempted "to match[] up" the crime scene "as best [they] could" by reconstructing the scene at night. The shoes were also arranged in certain ways, such as "plac[ing] something underneath the shoe" to "recreate the step and the walking motions" taken when the robber walked into the store, and

---

5. As defined, the crime of "aggravated robbery" includes the "use[] or threat[] to use a dangerous weapon," and can occur not only "during the commission of . . . a robbery," but also "in an attempt to commit . . . a robbery." *See* Utah Code Ann. § 76-6-302(1), (3) (LexisNexis 2017). In this case, Samora was charged with aggravated robbery even though he did not actually succeed in taking anything, and he does not contest the State's use of the statute in this manner.

"us[ing] the grout lines" in the floor to arrange the shoes exactly where the robber was when he approached the counter. Detective also held up the hoodie in front of the counter in roughly the same place the robber would have occupied, and at roughly the same height.

¶10 Through counsel, Samora filed a pretrial motion to exclude the comparison photos taken at the reconstructed crime scene. The trial court held a hearing to consider the motion, during which Detective testified about how the comparison photos had been generated. Detective also explained how, when viewing the comparison photos, it was not possible to see either the red coloring on the shoes or the chevron pattern on the hoodie; in those photos, taken using the store's surveillance system, the shoes appeared entirely white (apart from the black crisscrossed laces), and the hoodie "appear[ed] jet black," without any visible pattern. After argument, the court determined that the comparison photographs' probative value was high, that the evidence would "not be cumulative," and that the probative value was not substantially outweighed by considerations such as wasting time or confusing the jury. The court made a "conditional" ruling that the comparison photos were admissible, so long as the State "la[id] the adequate foundation" at trial.

¶11 After his arrest, Samora was detained in the county jail for several days, during which time he made several phone calls to his wife (Wife), in which they discussed the events that took place on the night of the robbery. The calls Samora made from jail were all being recorded, and he knew it. The State first asked the trial court to admit these recordings pursuant to rule 404(b) of the Utah Rules of Evidence. Samora objected and, after a hearing, the court ruled that none of the recordings were admissible under rule 404(b) because they did "not support . . . noncharacter purposes," and that, viewed through a prior-bad-acts lens, they were also inadmissible under rule 403 of the Utah

Rules of Evidence because "the probative value of the [calls was] substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury."

¶12 Later, however, the State made a more targeted effort, seeking admission of only five short clips of the phone calls, and this time representing that it had "carefully cut each clip to eliminate any [rule] 404(b) related conduct." This time, the State relied on rules 104(b) and 801(d)(2) of the Utah Rules of Evidence as the basis for admission, characterizing the statements Samora made in the five clips as utterances that a reasonable jury could find relevant as statements of a party-opponent. Samora's counsel objected to two of the clips in their entirety, and to part of a third clip; the trial court sustained that objection again under rule 403, and barred the State from introducing the clips to which Samora's counsel had objected. But Samora's counsel did not object to the two other clips and the remaining portion of the third clip, because she did not believe that Samora had "legal grounds to object" to them. The three clips that survived this pretrial motion were all played for the jury during trial.

¶13 The first of the three clips was from a call Samora placed to Wife on the day after he was arrested:

> Wife: Well, that's what, well, number one, did you actually get anything out of it?
>
> Samora: No.
>
> Wife: Did you actually take anything?
>
> Samora: No, it—
>
> Wife: Well, then they're—right now they're charging you with aggravated robbery, which they need to lower it to attempted if you didn't steal—if you didn't take anything.

    Samora: I didn't—I didn't even go in there, baby. [inaudible] Listen, I wasn't even around. These phones are recorded. I didn't—I wasn't even around there.

The second clip was from later in the same phone call:

    Samora: I ain't admitting to nothing. I'm just hypothetically saying . . .

    Wife:    Yeah.

    Samora: You already told me that the guy from the store followed me home.

    Wife:    Yeah.

    Samora: The guy from the store followed me home.

    Wife:    Yeah, I know. I saw him out there. I was like "Oh shit." That's the guy that I know that always gives me shit when I—you know, when I go in.

    Samora: Yeah. Where was he? Over by where the police parked?

    Wife:    Yeah.

    Samora: Oh. Did he see you?

    Wife:    You said—you said Conoco, so I thought you meant the Texaco. And then when I saw him, I thought, "Fuck, it was the Chevron."

    Samora and Wife:    [laughing]

And the third clip was from a phone call four days after the robbery, when Samora and Wife were again referring to Clerk:

Samora: Cuz [sic] he's always been our friend. I don't know why he'd accuse me of something.

Wife: Right.

Samora: We've always been good with him.

Wife: Yup.

Samora: Got no right to accuse me. You know, just challenge, say hey, you know, "That's my husband you're accusing." [inaudible]

Wife: Right. You know when adrenaline's pumping and things are happening, you know, your, you know, your perceptions of things tend to not be always accurate.

Samora: Yup. And so far, so good. I just—the thing that I've been thinking about too is he had to be real close to me to see me turn into the apartment. I—

Wife: Yeah.

Samora: I wasn't—I wasn't walking or running from nobody. So—

Wife: Uh-huh.

Samora: I don't know. You know, there's seven apartments. They could have seen anybody go into any apartment. I don't know why they are saying, or thinking, that it was our apartment, something that, you know—

Wife: Right.

Samora: Then we went right to the door and opened the door with some smokes.

Wife: Yeah.

Samora:  Ain't trying to hide.

Wife:    Yeah. Yes, I know, baby.

Samora:  Okay baby.

Wife:    We'll get this figured out.

Samora:  We got the plan. You got the plan now, though.

¶14    The case proceeded to trial, where the State attempted to lay sufficient foundation for admission of the comparison photos. To that end, Manager testified that the surveillance system cameras had not been moved since the robbery, and were in the same position when the comparison photos were taken. Clerk confirmed that neither the surveillance system nor the store itself had changed since the robbery occurred. Eventually, the court determined that the State had established sufficient foundation to admit the photos for "the very limited purpose" of allowing the jury to "compare" the reconstructed crime scene photos to the screenshots of the robbery. In its pretrial ruling, the court was careful to specify that it would ultimately be up to the jury to decide whether the comparison was effective, cautioning that the State would not be allowed to "present evidence on the ultimate issue as to whether [the] items and information depicted in the demonstrative photos are, in fact, [the] items and information reflected in the store's . . . surveillance footage" from the night of the robbery. At trial, the court enforced that edict, and determined after presentation of the evidence that the State had "not crossed that line."

¶15    The State also presented testimony from Clerk, Manager, Detective, and other police officers, each of whom testified about the robbery as outlined above. During his testimony, Clerk noted that, because of the mask on the robber's face, he had been

unable to definitively identify Samora in a photo lineup.[6] Clerk nevertheless testified that he was "100 percent positive" that the man he followed to the gray apartment building was the same person who had attempted to rob the store.

¶16 Samora defended the case chiefly on identity grounds, arguing that the State failed to prove that he was the robber depicted in the screenshots. In particular, Samora's counsel questioned Clerk's ability to effectively identify the person he was following because it was dark, and characterized the State as being "creative" for rendering the comparison photos after it had been unable to produce the actual surveillance video of the robbery. At the conclusion of the State's case-in-chief, Samora moved for a directed verdict, arguing that there was insufficient evidence to make a "prima facie case for identification." The court denied the motion, finding that there was "sufficient evidence from which a jury acting reasonably could convict the

---

6. Sometime during the investigation, Clerk was presented with a photo lineup depicting six individuals, colloquially known as a "six-pack lineup," from which he "was not able to make a positive identification." After being presented with the six-pack, Clerk indicated that, with respect to the first photo, he was "75 percent sure" it was the robber, and with respect to the second photo, he was "50 percent" confident that it depicted the robber. The second photo was a mugshot of Samora at the time of his arrest. Samora's defense strategy included suggesting that the individual depicted in the first photo of the lineup was actually the robber, and that the police just "dropped" the search for that individual after some investigative phone calls came up empty. Detective testified that he "tried to locate" this man, even contacting California state and federal authorities to attempt to find a last known address, but he was unable to determine the whereabouts of the individual from the first photo.

defendant and [that] the State ha[d] established a prima facie case on the charged offense."

¶17 After deliberation, the jury found Samora guilty of aggravated robbery, and the court later sentenced him to prison.

ISSUES AND STANDARDS OF REVIEW

¶18 Samora now appeals his conviction, and asks us to consider three main issues, as well as a motion for remand under rule 23B of the Utah Rules of Appellate Procedure. First, he asserts that the trial court erred by admitting the reconstructed comparison photos. Trial courts have "broad discretion to admit or exclude evidence," and we will disturb an evidentiary ruling "only for [an] abuse of discretion." *See State v. Perea*, 2013 UT 68, ¶ 31, 322 P.3d 624 (quotation simplified).

¶19 Second, Samora argues that the three audio clips from his jail phone calls should not have been admitted. Samora acknowledges that he did not object to these three clips at trial, and that therefore this challenge is not preserved. "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443. Samora invokes two of our preservation exceptions, and asks us to review this issue for both plain error and ineffective assistance of counsel. To "persuade an appellate court to reach [an] issue" based on the trial court's plain error, the appellant "must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *Id.* ¶¶ 19–20 (quotation simplified). And an ineffective assistance of counsel claim "raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (quotation simplified).

¶20     Third, Samora challenges the trial court's denial of his motion for directed verdict based on his contention that the evidence the State presented was insufficient to support a determination that he was the robber. "We will uphold a trial court's denial of a motion for directed verdict based on a claim of insufficiency of the evidence if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (quotation simplified).

¶21     Finally, Samora has filed a standalone motion with this court, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand his case for the trial court to make additional findings of fact relating to his ineffective assistance of counsel claim. "Rule 23B allows this court to remand a criminal case 'to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel.'" *State v. Powell*, 2020 UT App 63, ¶ 11, 463 P.3d 705 (quoting Utah R. App. P. 23B(a)). Such a remand will only be granted if the movant has brought forth "a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Admissibility of the Challenged Evidence

¶22     Samora's first two challenges concern evidence that he believes was improperly admitted. First, Samora asserts that the trial court abused its discretion by admitting the comparison photos into evidence at trial. Second, he asserts that the court plainly erred by admitting, and that his counsel rendered ineffective assistance by failing to object to the admission of,

three discrete audio clips of his jail phone calls with Wife. We discuss each of these challenges, in turn.

## A.  Comparison Photos

¶23    Samora's challenge to the trial court's decision to admit the comparison photos is rooted in rule 901 of the Utah Rules of Evidence. Citing that rule, he asserts that the State did not lay sufficient foundation to authenticate those photos. We find this argument unpersuasive; indeed, we commend the trial court's thorough efforts to ensure the State laid the requisite foundation.

¶24    Rule 901 requires parties to authenticate proffered evidence; the rule provides that one way in which parties may do so is by offering witness "[t]estimony that an item is what it is claimed to be." Utah R. Evid. 901(a), (b)(1). For photographic evidence, "the general rule in Utah is that when a competent witness with personal knowledge of the facts represented by a photograph or video testifies that the photograph accurately reflects those facts, it is admissible." *State v. Bloomfield*, 2003 UT App 3, ¶ 24, 63 P.3d 110 (quotation simplified); *accord State v. Wager*, 2016 UT App 97, ¶ 13, 372 P.3d 91; *see also State v. Perea*, 2013 UT 68, ¶ 47, 322 P.3d 624 (stating that "there must be some showing that the evidence itself supports the proffered conclusion").[7]

---

7. Samora asserts—citing *State v. Perea*, 2013 UT 68, 322 P.3d 624—that the photos qualify as "demonstrative evidence," and argues therefrom that they are subject to an altogether different analysis for admissibility. In *Perea*, our supreme court did indeed articulate different admissibility standards, under rule 901 of the Utah Rules of Evidence, for demonstrative versus substantive evidence. *See id.* ¶¶ 45–49. However, we agree with both parts of the State's assertion that (1) the comparison photos are actually "substantive evidence"—indeed, the photos have independent

(continued…)

¶25    In this situation, the record reveals that, not only did "a competent witness with personal knowledge of the facts" represented by the comparison photos testify that the photographs "accurately reflect[ed] those facts," *see Bloomfield*, 2003 UT App 3, ¶ 24 (quotation simplified), but several witnesses testified in this regard. Most importantly, the State elicited testimony from Detective, who testified extensively—both at trial and during a pretrial hearing—about how the comparison photos were generated. Detective's testimony indicated that the comparison photos depicted images of the dark-colored hoodie recovered from Samora's apartment and the white shoes found on Samora's person at the time of the arrest. He further explained that the clothing items were arranged in spots designed to replicate the placement of the robber's clothing on the night of the robbery, and he detailed how he and the forensic examiner "placed something underneath the shoe" to "recreate the step and the walking motions" taken when the robber walked into the store, and "used the grout lines" in the floor to arrange the shoes where the robber would have been when he approached the counter. Detective also testified that they tried to

_____

(…continued)

probative value and were not produced merely to "illustrate a witness's testimony," *see id.* ¶¶ 45–46—but (2) in any event, "[t]he distinction between demonstrative and substantive evidence does not affect the outcome here." As noted in *Perea*, "substantive evidence . . . must . . . meet a higher threshold showing than that required for demonstrative evidence," so if the "foundational burden" for admitting substantive evidence is met, then the evidence is admissible. *See id.* ¶¶ 47, 49. Accordingly, we proceed by applying the standard for admission of substantive evidence under rule 901: the proponent must show "that the evidence itself supports the proffered conclusion." *Id.* ¶ 47.

recreate "the same conditions" as the original robbery by taking the comparison photos "at night" to "match" the lighting, and by "shut[ting] down the store" to ensure there would not be any "foot traffic." Detective also attested to maintaining the "chain of custody" over the two clothing items. Furthermore, Manager testified, and Clerk affirmed, that the surveillance cameras had not been moved since the robbery, and that they were in the same position when the comparison photos were taken as they were on the night of the robbery.

¶26 Given all of this testimony, the court determined that the State had established sufficient foundation to admit the photos for "the very limited purpose" of allowing the jury to "compare" the reconstructed crime scene photos to the screenshots of the robbery. The court warned the State, however, that it would not be allowed to "present evidence on the ultimate issue as to whether the items and information depicted in the demonstrative photos are, in fact, [the] items and information reflected in the store's . . . surveillance footage" from the night of the robbery. In the court's view, it should be up to the jury to determine whether the comparison was effective. And at trial, the court enforced this restriction, determining after presentation of the evidence that the State had "not crossed that line," and that Detective possessed "the proper foundation and knowledge to testify to these issues."

¶27 Under these circumstances, the State laid sufficient foundation to support what the comparison photos were used for: to allow the jury to compare what the recovered hoodie and shoes would look like if captured on the same surveillance system that captured the robbery in action. In our view, the trial court's actions in ensuring that proper foundation had been laid for these photos were thorough and appropriate. We perceive no abuse of discretion in the court's handling of this matter.

### B. Audio Clips of Jail Phone Calls

¶28 Samora next challenges the admission of the three short audio clips from his jailhouse phone calls with Wife. This challenge has three subparts: Samora first characterizes these clips as "confessions," and asserts that the clips are not sufficiently "trustworthy" to be admitted as such; next, he claims that the clips were unfairly prejudicial in violation of rule 403; and finally, he contends that his calls to Wife were protected by Utah's spousal communications privilege.

¶29 Each of these challenges is unpreserved. Although Samora objected to the State's initial efforts to admit recordings of the jail phone calls pursuant to rule 404(b), and objected to the State's efforts to admit *other* clips of those phone calls with Wife pursuant to rule 801(d)(2), those other objections were sustained in their entirety. But Samora did not object to the State's efforts to admit, pursuant to rule 801(d)(2), the three clips that were ultimately played for the jury. Because these challenges are unpreserved, Samora asks that we review them for plain error and ineffective assistance of counsel. We first discuss Samora's contention that the trial court plainly erred, and then discuss his contention that his trial counsel rendered ineffective assistance.

#### 1. Plain Error

¶30 To establish that the trial court plainly erred, Samora must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there [was] a reasonable likelihood of a more favorable outcome" at trial. *State v. Bond*, 2015 UT 88, ¶ 15, 361 P.3d 104 (quotation simplified). "If any one of these requirements is not met, plain error is not established." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). "For an error to be obvious to the trial court, the party arguing for the exception to preservation must show that the law

governing the error was clear, or plainly settled, at the time the alleged error was made." *Id.* ¶ 21 (quotation simplified).

a.      Trustworthiness

¶31     Samora first raises a "trustworthiness" argument with regard to the audio clips. He characterizes several statements in those clips as being "in the nature of" confessions, and asserts that, as confessions, the statements in the audio clips cannot be admitted unless they meet a "trustworthiness standard." *See State v. Mauchley*, 2003 UT 10, ¶¶ 19–20, 67 P.3d 477 (adopting a "trustworthiness standard," under which "it is the responsibility of the trial judge to determine as a matter of law whether a defendant's confession is sufficiently trustworthy or reliable to be admitted into evidence"). Samora asserts that the trial court committed plain error by allowing the audio clips to come into evidence without first determining that they were sufficiently trustworthy. We see two problems with this argument.

¶32     First, we are not persuaded that the statements Samora made in the audio clips qualify as the sort of "confessions" to which the "trustworthiness standard" applies. At the outset, we note that there is an important distinction between a confession and a simple admission: "An admission is an acknowledgment by the accused of certain facts that tend, together with other facts, to establish the accused's guilt, whereas a confession is an acknowledgment of guilt itself. . . . Furthermore, although every confession is an admission, not every admission is a confession." 29 Am. Jur. 2d *Evidence* § 700 (2021) (quotation simplified). Indeed, our supreme court affirmed a trial court's ruling and adopted its reasoning in distinguishing between a confession and an admission:

> A confession is a voluntary statement on the part of the defendant, . . . which admits guilt, or in which he discusses the commission of the act, as well as a confession of the doing of the act, [and] admits

guilt of the surrounding circumstances. An admission is merely an admission on the part of the defendant as to some particular act, or some particular thing which in itself does not constitute a confession of guilt, but from which might be drawn an inference that the defendant might have been at the place, at least.

*State v. Hymas*, 131 P.2d 791, 792 (Utah 1942) (quotation simplified); *see also id.* at 792–93 (conducting its own analysis of the statement at issue and determining that, "[a]t the most, the statement could be nothing more than an admission," and concluding that it had therefore not been necessary to apply the standard for admitting confessions); *accord State v. Barbero*, 442 P.3d 224, 225 (Or. Ct. App. 2019) ("Not all statements by the defendant are confessions. . . . A confession is an acknowledgement of guilt made by a person after an offense has been committed. An admission is a statement made for some purpose other than to acknowledge guilt." (quotation simplified)). For instance, in *Mauchley*, the defendant traveled on his own to the police station and "voluntarily confessed" to committing the crime in question. *See* 2003 UT 10, ¶ 6. Certainly, a statement given to police for the express purpose of voluntarily accepting responsibility for a crime qualifies as a confession. *See* 29 Am. Jur. 2d *Evidence* § 699 (2021) ("A confession is a voluntary statement by the accused that the accused engaged in conduct that constitutes a crime. It is a direct acknowledgement of guilt on the part of the accused, implicitly admitting all the essential elements necessary to establish the crime of which the accused is charged." (quotation simplified)).

¶33    But the statements made by Samora to Wife during the jailhouse phone calls are of a different nature. In making those statements, Samora did not appear to acknowledge guilt for the robbery; rather, he was just discussing with Wife the particulars of his whereabouts on the evening in question. *See id.* § 700. His

references in those calls to perhaps being the person Clerk was following may be probative statements because they are "admission[s] of incriminating facts" from which a factfinder could infer guilt, but they do "not amount[] to a confession" because there is no indication that those statements were made for the purpose of acknowledging criminal liability. *See* E.H. Schopler, Annotation, *Corroboration of Extrajudicial Confession or Admission*, 45 A.L.R.2d 1316, § 5[a] (originally published in 1956). Admissions, just like other statements that do not qualify as confessions, may be admitted into evidence pursuant to rule 801(d)(2) of the Utah Rules of Evidence as statements of a party-opponent, even without a specialized showing of trustworthiness, provided that the requirements of that rule are otherwise met. *See generally* 29 Am. Jur. 2d *Evidence* § 757 (2021) (noting that, "in both civil and criminal cases, . . . an admission or statement of a party is not considered hearsay and may be used against the party" and that "an admission of a party opponent need only traverse the low hurdles of relevancy and materiality to survive an objection to its admission into evidence" (quotation simplified)). That was the basis upon which the trial court admitted the audio clips, and Samora makes no meaningful effort to argue that the court misapplied rule 801(d)(2).[8]

---

8. Samora does appear to cursorily argue that portions of the first clip are inconsistent with rule 801(d)(2) of the Utah Rules of Evidence, but to the extent he attempts to make such an argument, it is inadequately briefed. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed."); *accord State v. Thornock*, 2020 UT App 138, ¶ 36, 475 P.3d 475. Samora only mentions rule 801(d)(2) with regard to the first audio clip, and even then he simply makes the bare assertion that one of his statements in the clip "is not an adoptive

(continued…)

¶34    Second, even if we were to assume, for purposes of the discussion, that Samora's statements were confessions subject to the trustworthiness standard, Samora has not carried his burden of demonstrating that the trial court plainly erred in assuming the statements to be sufficiently trustworthy. After all, Samora made the statements voluntarily during casual conversation with Wife, without any hint of coercion, all while knowing that he was being recorded, and neither the statements themselves nor the context in which they were made contains any suggestion that his statements were not trustworthy. *See Mauchley*, 2003 UT 10, ¶ 52 (stating that "evidence as to the spontaneity of the statement" and "the absence of deception, trick, threats, or promises to obtain the statement" has "applicability in determining the trustworthiness of confessions"). Indeed, the statements demonstrate a familiarity on Samora's part with the crime scene and some features of the robbery itself, a factor that our supreme court has identified as a hallmark of trustworthiness. *See id.* ¶ 54 (stating that "[o]ne of the ways a confession may" be considered trustworthy is when

---

(…continued)

admission pursuant to Utah R. Evid. 801(d)(2)," instead characterizing it as "a denial." But Samora makes no further attempt to explain why this matters; indeed, simply because he was the one who made the statement and the State offered it into evidence against him at trial, the statement is eligible for admission under rule 801(d)(2). *See* Utah R. Evid. 801(d)(2)(A) (providing that out-of-court statements made by a litigant—which might otherwise be considered hearsay—are admissible if offered against that party at trial). And for us to address an argument, that "argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). Samora has not done so here, and accordingly we decline to discuss the issue further.

it is "bolstered by independent evidence" showing that "the individual has specific personal knowledge about the crime"). And in this case, there is also independent corroboration of Samora's involvement in the robbery, including the screenshots, the comparison photos, and Clerk's testimony.

¶35    Accordingly, we find no error at all, let alone plain error, in the trial court's admission of the audio clips without first making an express finding of trustworthiness.

b.    Rule 403

¶36    Samora next asserts that the trial court plainly erred by not ruling sua sponte that the remaining three phone clips violated rule 403 of the Utah Rules of Evidence. Under that rule, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "The critical question in a rule 403 analysis for unfair prejudice is whether certain testimony is so prejudicial that the jury will be unable to fairly weigh the evidence." *State v. Jones*, 2015 UT 19, ¶ 30, 345 P.3d 1195 (quotation simplified). Importantly, "evidence is not [made] unfairly prejudicial because it tends to prove guilt, but [rather] because it tends to encourage the jury to find guilt from improper reasoning." *Id.* (quotation simplified); *see also State v. Wilson*, 2020 UT App 30, ¶ 30, 461 P.3d 1124 (noting that "all probative evidence is prejudicial to the party against whom it is introduced," but that "such prejudice is not necessarily unfair" (quotation simplified)). Improper reasoning, in this context, "commonly but not necessarily" involves a non-evidentiary "emotional" component, "such as bias, sympathy, hatred, contempt, retribution or horror." *State v. Rodriguez*, 2012 UT App 81, ¶ 4, 274 P.3d 1012 (quotation simplified); *accord State v. Bermejo*, 2020 UT App 142, ¶ 27, 476 P.3d 148, *petition for cert. filed*, Dec. 22, 2020 (No. 20200933).

¶37     In this case, however, the audio clips are not unfairly prejudicial, and certainly not obviously so. The clips have high probative value because they contain statements by Samora that indicate that he might have been the man Clerk followed. The court did determine, in connection with the State's initial effort to admit the jailhouse phone calls pursuant to rule 404(b), that all of those calls together were "inadmissible under rule 403." But that pronouncement must be viewed in the context of the rule 404(b) motion. And at the hearing during which the court considered the State's second motion to admit the phone calls as conditionally relevant statements of a party-opponent pursuant to rules 104(b) and 801(d)(2), Samora objected to some portions of those clips, which objection the court sustained in part "because [the statements] may be misleading or confusing to the jury." But no such objection was lodged in connection with the State's second motion with regard to the three clips that were ultimately played for the jury. Although the three clips are certainly prejudicial to Samora's assertion that he was not the robber, we perceive no reason why they would be *unfairly* prejudicial, much less obviously so; the inference to which they lead—that Samora might be the robber—is one based on evidence, and not on some improper emotional basis.[9] The trial court did not commit any error, let alone an obvious one, by not sua sponte excluding the three audio clips pursuant to rule 403.

---

9. In addition to asserting unfair prejudice, Samora objects to at least one of the clips as being "confusing" and "misleading" due to potential ambiguity about whether Samora was actually admitting anything. Whether his statements should be construed as an admission of his involvement is a question for the factfinder. We perceive nothing unusually confusing or misleading about that interpretive question; indeed, in our view, a jury could have reasonably concluded, in context, that Samora was acknowledging involvement in the robbery.

c.      Spousal Communications Privilege

¶38    Samora next argues that the trial court plainly erred by not sua sponte excluding certain portions of the clips because they were protected by Samora's spousal communications privilege. In Utah, the spousal communications privilege allows a defendant "to prevent his or her spouse . . . from testifying as to any confidential communication made by the individual to the spouse during their marriage; and to prevent another person from disclosing any such confidential communication." Utah R. Evid. 502(c); *accord* Utah Const. art. I, § 12; Utah Code Ann. § 78B-1-137(1)(a) (LexisNexis 2017). "Confidential communication" is defined as "a communication[] made privately by any person to his or her spouse; and not intended for disclosure to any other person." Utah R. Evid. 502(a)(1).

¶39    Thus, whether the spousal communications privilege protects Samora's conversations with Wife hinges on whether the conversations can fairly be considered to have been "made privately . . . *and* not intended for disclosure to any other person." *See id.* (emphasis added). Although Utah courts have not yet squarely considered whether this privilege applies to recorded phone calls between a prisoner and his or her spouse,[10]

---

10. Samora asserts that Utah courts have considered this issue, at least implicitly, and directs our attention to *Zaragoza v. State*, 2017 UT App 215, 407 P.3d 1122. He suggests that *Zaragoza* stands for the proposition that "most courts apply the 'forfeiture-by-wrongdoing' doctrine to allow otherwise privileged calls to be introduced notwithstanding a recognition of the marital privilege." But Samora overstates the applicability of that case to the situation at hand. In *Zaragoza*, our only discussion of the spousal communications privilege was to describe a lower court ruling—one that was not at issue on appeal—in which the court admitted two out-of-court

(continued…)

most other courts to consider the question have concluded that the privilege does not apply to jailhouse phone calls, particularly where, as here, inmates are made aware before placing calls that their conversations are being recorded. *See, e.g.*, *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (holding that the trial court did not err in admitting tape-recorded conversations between defendant and her husband while her husband was in jail, "because the marital communications privilege protects only communications made in confidence" and it is "well-known" that "communications made from jail" are monitored and "likely to be overheard by others" (quotation simplified)); *United States v. Tartaglione*, 228 F. Supp. 3d 402, 407–08 (E.D. Pa. 2017) ("[T]he law is clear that, where one spouse is imprisoned, communications between the married couple on prison telephones are not made in confidence."); *Bloom v. Toliver*, No. 12-CV-169-JED-FHM, 2015 WL 5344360, at *9 (N.D. Okla. Sept. 14, 2015) (holding that the marital communications privilege did not apply to a phone call between a detention officer and his wife because, among other reasons, "all calls at the [j]ail are routinely recorded, and [the officer] was on duty during the lengthy call to his wife, both of which counter any argument of an expectation of privacy during his communication"); *Dixson v. State*, 865 N.E.2d 704, 713–14 (Ind. Ct. App. 2007) (holding that, where there is evidence that "inmates are notified that calls are recorded and/or monitored by means of an automated message

(…continued)
statements by the defendant's wife to police on the basis that the defendant "had intentionally made [his] [w]ife unavailable to testify through his own wrongful actions, and therefore the forfeiture-by-wrongdoing doctrine applied." *See id.* ¶ 7. Other than that cursory description of the basis of a lower court's evidentiary ruling, we made no mention in *Zaragoza* of the spousal communications privilege, and we offered no opinion on its applicability to jailhouse phone calls.

played at the beginning of each call," it is within the trial court's discretion to conclude that an inmate's "conversation with his wife was made in the presence of a third party, i.e., the [government] and its agents"). *But see State v. Modica*, 186 P.3d 1062, 1064 (Wash. 2008) (en banc) (opining that "[s]igns or automated recordings that calls may be recorded or monitored do not, in themselves, defeat a reasonable expectation of privacy," and suggesting that if a prisoner's phone calls had been "to his lawyer or otherwise privileged," the calls might have been considered private to bar their admissibility in a criminal case). And this makes sense because, after all, "[t]he presence of a device monitoring and recording all phone calls made in prison is the functional equivalent of a third party listening to the conversations," *see Tartaglione*, 228 F. Supp. 3d at 408, and the privilege applies only to *confidential* communications between spouses, *see* Utah R. Evid. 502(c).[11]

¶40 But in any event, this question "is an interesting and multifaceted one that has not yet been answered by Utah's appellate courts," meaning that "there is no *settled* appellate law governing the question." *See State v. Oliver*, 2018 UT App 101, ¶ 43, 427 P.3d 495 (emphasis added) (quotation simplified). To the extent there is any consensus in the case law on this issue, it

---

11. Samora asserts that, "irrespective of his statement that the phones were recorded, the marital privilege would apply in any event because [Wife]'s statements were made with an understanding that they were confidential." But as noted, most courts have held that jailhouse phone calls cannot reasonably be considered confidential, even by the spouse who is not incarcerated, because "communications made from jail are likely to be overheard by others, and, thus, it is unreasonable [for the non-imprisoned spouse] to intend such a communication to be confidential." *See United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (quotation simplified).

appears that any such consensus runs in the State's direction. Under these circumstances, Samora cannot "show that the law governing the error was clear or plainly settled" in his favor such that it would have been "obvious to the trial court" that the spousal communications privilege barred admission of the audio clips. *See id.* (quotation simplified); *see also State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443. Accordingly, the court did not commit plain error by declining to sua sponte exclude the audio clips pursuant to the spousal communications privilege.

¶41 Thus, for all of these reasons, Samora has not carried his burden of showing that the trial court plainly erred by not sua sponte excluding the three audio clips from evidence at trial, either under a trustworthiness standard, rule 403, or the spousal communications privilege.

2. Ineffective Assistance of Counsel

¶42 Samora also argues that his trial counsel rendered constitutionally ineffective assistance by failing to object to admission of the phone calls under the same three evidentiary rules we have just discussed. *See supra* ¶¶ 31–41. To establish that his counsel was constitutionally ineffective, Samora must show that (1) his "counsel's performance was deficient," and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). To determine whether counsel's performance was deficient under the first part of the test, we apply "the deficiency standard announced in *Strickland*" and ask whether counsel's actions "fell below an objective standard of reasonableness." *See State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (quotation simplified). In the context of this case, it is important to note that "[f]ailure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000

UT 41, ¶ 26, 1 P.3d 546; *accord State v. Newton*, 2020 UT 24, ¶ 24, 466 P.3d 135.

¶43    Samora's trial counsel did not perform deficiently by failing to object to admission of the three audio clips played for the jury at trial. For the reasons already discussed, *see supra* ¶¶ 31–37, neither rule 403 nor any "trustworthiness standard" requires exclusion of the audio clips, and any attempt counsel might have made to object to their admission pursuant to those rules would have been futile. *See Kelley*, 2000 UT 41, ¶ 26.

¶44    Objecting to admission of the audio clips pursuant to the spousal communications privilege may have been unsuccessful, given the absence of Utah case law on the question and given the fact that the weight of case law from other jurisdictions seems to favor the State's position. But even if an objection on this basis carried some chance of success, we do not think it was objectively unreasonable, under the circumstances, for counsel to decide not to make it. Although we recognize, as our supreme court did in *State v. Silva*, 2019 UT 36, 456 P.3d 718, that situations exist in which an attorney performs deficiently by failing to "raise an argument not supported by existing legal precedent," *id.* ¶¶ 19–20, it is not the case that attorneys must raise every conceivable objection in order to render constitutionally effective assistance. The United States Supreme Court has "never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, in deciding whether to lodge objections, attorneys are entitled to "pick [their] battles," and do not have "a Sixth Amendment obligation" to object to everything. *See State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871; *see also State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an

inherently strategic business."). "We must view a decision to not object in context and determine whether . . . failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *See Ray*, 2020 UT 12, ¶ 32.

¶45   In this situation, with out-of-state case law weighing largely against Samora's position, and with other pressing matters also of concern in the fast-paced context of the trial, we do not view it as objectively unreasonable for counsel to have opted not to lodge an objection to the three audio clips pursuant to the spousal communications privilege. In similar situations, our supreme court has determined that counsel did not perform deficiently by failing to object. *See, e.g., Myers v. State*, 2004 UT 31, ¶¶ 22–23, 94 P.3d 211 (holding that, where "there were no cases on point in Utah, and other jurisdictions were split on the issue," it was "likely that counsel made a tactical decision not to pursue a . . . challenge" on that basis, which decision "could not be considered ineffective assistance" (quotation simplified)). Samora's trial counsel successfully resisted prosecutorial attempts to admit *all* of Samora's jailhouse phone calls pursuant to rule 404(b), and then successfully fought off a second prosecutorial attempt to admit several additional more targeted clips pursuant to rule 801(d)(2). By all appearances, counsel thoroughly examined the issues surrounding admissibility of the jailhouse phone calls, and concluded that she had no "legal grounds to object" to the three clips that were ultimately admitted. Based on our review of the record, and our understanding of applicable case law, counsel did not act unreasonably in reaching this conclusion, and did not perform deficiently by failing to lodge an objection to the final three clips.

¶46   In the end, we reject all of Samora's arguments related to the admission of the comparison photos and the three audio clips of his jailhouse phone calls.

II. Sufficiency of the Evidence

¶47    Samora next contends that the trial court erred when it denied his motion for directed verdict because, according to him, the evidence presented to the jury was insufficient to prove that he was the robber. When considering a motion for directed verdict, trial courts are "not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *State v. Montoya*, 2004 UT 5, ¶ 32, 84 P.3d 1183 (quotation simplified). "Rather, the court's role is to determine whether the state has produced believable evidence on each element of the crime from which a jury, acting reasonably, could convict the defendant." *Id.* (quotation simplified). "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *State v. Garcia*, 2017 UT 53, ¶ 62, 424 P.3d 171 (quotation simplified). And if a trial court denies a motion for directed verdict, we may reverse only if we are unable to conclude that, "viewed in the light most favorable to the State, *some* evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Gonzalez*, 2015 UT 10, ¶ 27, 345 P.3d 1168 (emphasis added) (quotation simplified).

¶48    In reviewing a denial of a directed verdict motion based on sufficiency of the evidence, we begin by listing the evidence that is pertinent to "the central issue that was before the jury." *See Montoya*, 2004 UT 5, ¶ 31. Both at trial, and in Samora's motion for directed verdict, the primary issue was the identity of the robber. The State's "identity" evidence included the following: (1) the six screenshots of the surveillance system footage from the night of the robbery, depicting a masked man with a horseshoe-shaped receding hairline, who was wielding a knife and wearing a dark-colored hoodie, dark shorts, and white shoes with black laces tied in a crisscross pattern; (2) a

photograph of Samora when he was arrested, which showed that he had a horseshoe-shaped receding hairline, and that he was wearing black shorts and white shoes with small red stripes on the sides and black shoelaces laced in a distinctive crisscross pattern; (3) a photograph of the dark-colored hoodie recovered from Samora's apartment; (4) a photograph of the kitchen knife recovered from his apartment and testimony from Detective about where it was found in the apartment; (5) additional testimony from Detective about his search of the apartment and how he came to find the knife and hoodie; (6) the comparison photos showing what the recovered dark-colored hoodie and the shoes looked like when photographed by the store's surveillance system; (7) testimony from Clerk, who described what the robber was wearing, and how Clerk followed the robber and witnessed him going into the front door of an apartment building that turned out to be Samora's residence; (8) Clerk's statement that he was "100 percent positive" that the man he followed to the apartment building was "the same person" who tried to rob the store; and finally, (9) Samora's own statements in the jailhouse phone calls, in which he stated that he did not "take anything" from the store, that Clerk "followed me home," and that Clerk "had to be real close to me to see me turn into the apartment." Samora attempts to downplay all of this evidence, claiming that it "was all speculative secondary evidence." That assertion is demonstrably incorrect—indeed, Clerk's firsthand observations in particular are neither secondary nor speculative. But even if the State's evidence could be considered "largely circumstantial," our supreme court has stated that, "if there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged or any of its degrees, it is the trial court's duty to submit the case to the jury." *Id.* ¶ 33 (quotation simplified).

¶49　This is not a case in which there was "no competent evidence that would support a verdict" of guilt. *See Garcia*, 2017 UT 53, ¶ 62 (quotation simplified). To the contrary, the State

presented evidence that was "believable," even if some of it was circumstantial and required inferences on the part of the factfinder; in such a scenario it was not for the trial court to "invade the province of the jury, whose prerogative it is to judge the facts." *See Montoya*, 2004 UT 5, ¶ 32 (quotation simplified). On the record before us, there was plenty of evidence from which a reasonable jury could have made a finding, beyond a reasonable doubt, that Samora was the robber. Accordingly, Samora cannot meet his burden of demonstrating that the court erred in denying his motion for directed verdict.

### III. Rule 23B Motion

¶50    Finally, we discuss Samora's motion, filed with this court pursuant to rule 23B of the Utah Rules of Appellate Procedure, in which he asks us to remand the case for further factfinding relating to his ineffective assistance of counsel claim. Under rule 23B, "[a] party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). We apply a "four-part test to evaluate rule 23B motions": (1) the motion must allege facts that are not already in the record; (2) the alleged facts must not be "speculative," meaning that the movant must attach to the motion evidence supporting the alleged facts, often in the form of affidavits "submit[ting] specific facts and details that relate to specific relevant occurrences"; (3) the alleged facts must be able to support a determination that counsel acted deficiently; and (4) the alleged facts must be able to support a determination that the defendant was prejudiced by counsel's deficient performance. *See State v. Griffin*, 2015 UT 18, ¶¶ 18–21, 441 P.3d 1166; *accord* Utah R. App. P. 23B.

¶51    In his rule 23B motion, Samora asserts that trial counsel unreasonably neglected to bring two facts to the court's attention during trial: (a) that he has several tattoos on his hands, whereas

no tattoos can be seen on the robber's hands in the screenshots; and (b) that in the screenshots the robber appears to be wearing a wedding ring, but "no ring [was] taken from [Samora] at the time he was booked" following his arrest. Samora's motion was accompanied by affidavits and photographs demonstrating that he had tattoos on his hands at the time of trial, and that he was not wearing a wedding ring when he was booked into jail on the night of the robbery. These facts are not found anywhere else in the record, and are not "speculative"; therefore, Samora has satisfied the first two elements of the four-part test. *See Griffin*, 2015 UT 18, ¶¶ 18–19.

¶52    But we agree with the State that, on the rule 23B record presented here, Samora cannot satisfy the other two elements of the test. With regard to the wedding ring issue, Samora's evidence demonstrates neither deficient performance nor prejudice. As the State points out, a ring is easily and quickly removable, and Samora had at least several minutes in his apartment before officers arrived. Hence, the fact that he was not wearing a ring when he was booked into jail has minimal probative value, given a ring's easily removable nature. Thus, we cannot say that counsel acted unreasonably by not bringing this fact to the court's attention, and we do not perceive a reasonable probability of a different outcome even if she had. *See id.* ¶¶ 20–21.

¶53    We reach a similar conclusion with regard to the tattoos. According to the affidavit submitted with the rule 23B motion, Samora had tattoos at the time of trial. But neither that affidavit, nor any other material submitted with the rule 23B motion, contains any evidence that Samora had any tattoos on his hands *at the time of the robbery*. As the State points out, the fact that Samora had tattoos on his hands is a fact that attains appreciable probative value only if he had them on the night of the robbery. Samora's trial took place some fourteen months after the robbery, and the proffer Samora submitted with his motion

contains no information about whether he had tattoos on his hands at the time of the robbery, and does not rule out the possibility that he acquired them during the fourteen-month period between the robbery and the trial. The fact that Samora had tattoos at the time of trial, but not necessarily at the time of the robbery, is not a fact of great assistance to Samora, and an attorney would be well within the bounds of reasonability to decline to raise that issue during trial. *See id.*

¶54 Samora attempts to cure the deficiencies in his rule 23B proffer by submitting an additional affidavit with the reply brief he filed in support of his rule 23B motion. But that action comes too late, and does not give the State an opportunity to respond. Rule 23, which "governs the form of motions" submitted to Utah's appellate courts, *see id.* ¶ 13, dictates that "[t]he moving party may file a reply only to answer new matter raised in the response," Utah R. App. P. 23(c). And Rule 23B itself requires that "[t]he *motion must include* or be accompanied by affidavits alleging facts not fully appearing in the record." *Id.* R. 23B(b) (emphasis added). In addition, our supreme court has long held that new issues, arguments, or evidence raised for the first time in a reply brief will not be considered. *See Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540 (stating that "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court" in order "to prevent the resulting unfairness to the respondent if an argument or issue was first raised in the reply brief and the respondent had no opportunity to respond"). And we have previously applied this principle in the context of rule 23B motions. *See, e.g., State v. Asta*, 2018 UT App 220, ¶ 16 n.1, 437 P.3d 664 (refusing to allow a defendant to use rule 23B to raise an ineffective assistance claim, by separate motion, that was not raised in the opening brief); *State v. Bryant*, 2012 UT App 264, ¶ 24 n.5, 290 P.3d 33 (refusing to consider a request, raised for the first time in a reply brief on appeal, that we remand a case pursuant to rule 23B). Accordingly, we hold

that Samora may not present an entirely new affidavit with a reply brief in support of his rule 23B motion. Allowing Samora to do so would run counter to the text of rules 23 and 23B, as well as our long-standing rules regarding the content and purpose of reply briefs.

¶55    Samora protests that the matter raised in the reply-brief affidavit is not a "new" matter, and was placed in the record simply to counter the arguments made by the State in its response brief. We disagree. A respondent who, in its response brief, identifies evidentiary gaps in the movant's presentation does not thereby open the door to the wholesale presentation of entirely new evidence in connection with a reply brief. *See State v. Kruger*, 2000 UT 60, ¶¶ 20–21, 6 P.3d 1116 (holding that the State "point[ing] out in a footnote that [the defendant] had not raised [an] issue in the trial court or in his opening brief on appeal . . . did not constitute a 'new matter' entitling [the defendant] to brief the issue in his reply brief"). Under the circumstances presented here, Samora's new affidavit submitted with his reply brief came too late, and will not be considered.

¶56    Without that affidavit, Samora cannot satisfy his rule 23B burden. Trial counsel did not act unreasonably by failing to bring to the court's attention the fact that Samora had tattoos on his hands *at the time of trial*, and we do not perceive a reasonable probability of a different trial outcome even if she had.

¶57    For all of these reasons, we deny Samora's rule 23B motion.


CONCLUSION

¶58    The trial court did not err in admitting the comparison photos into evidence. We perceive neither plain error nor ineffective assistance of counsel regarding the admission of the three audio clips from Samora's jailhouse phone calls with Wife.

The court did not err in denying Samora's motion for directed verdict regarding identity. And we find no merit in his rule 23B motion. Accordingly, we affirm Samora's conviction.

———————