**2024 UT App 151**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
PHILLIP MASON KING,
Appellant.

Opinion
No. 20210710-CA
Filed October 24, 2024

Second District Court, Ogden Department
The Honorable Michael D. DiReda
No. 191900996

Freyja Johnson and Hannah K. Leavitt-Howell,
Attorneys for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      A jury convicted Phillip Mason King of aggravated assault and commission of domestic violence in the presence of a child. King now appeals those convictions, asserting that the trial court abused its discretion by allowing certain testimony and that his attorney rendered ineffective assistance. We reject King's arguments and affirm his convictions.

BACKGROUND[1]

¶2     One morning, a woman—Anna[2]—turned up at a local police station. She was obviously injured: she had "black and swollen eyes," red marks on both sides of her throat, two bite marks on her shoulders, a cut on her left elbow, and bruises and scrapes in various places on her body. She explained to the investigating officer (Officer) that, on the previous evening, there had been an argument between her and her husband, Phillip King. At some point, the argument turned physical and, according to Anna's version of events, King had "shoved" and "pushed" her into the bathroom, where he began "hitting" and "smashing" her head into the "cabinet above the sink" to the point where Anna thought she was "going to die." In the process, King also had his hands on Anna's throat and was strangling her. As this was going on, Anna could hear her young son "screaming and crying" in the background. Anna recalled that, at one point, she momentarily blacked out.

¶3     Anna was eventually able to escape from the bathroom and go to her son's room, where she grabbed her phone and attempted to leave. But King intervened. He came into the room and "smashed [Anna's] phone" and "put it in his pocket." After that, King proceeded to again hit Anna about the head and to choke her by the throat. In the process, King bit Anna, "pinned [her] on the floor," and strangled her until she blacked out again. Anna recalled that, during the attack, King was calling her insulting names, as well as telling her that she "need[ed] to see God and

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (quotation simplified).

2. A pseudonym.

answer to him" and that "she deserve[d] to die." Eventually, King stopped the attack, and Anna "grabbed whatever [she] could," ran out to her car, and eventually made it to the police station.

¶4 After hearing Anna's account, Officer drove to the couple's house to speak with King and to check on the child. King admitted to Officer that he and Anna had "been in an argument" and that he had grabbed Anna around the throat in a purposeful attempt "to get her to pass out." But King told Officer that his actions were taken in self-defense, because Anna had started the altercation by hitting him "on the right shoulder with a closed fist." As King put it, he had been trying "to grab [Anna] by the throat and push her into the bathroom" and had been "trying to get her to pass out to stop from being assaulted." King "wasn't sure" whether Anna actually passed out, but he "didn't believe so." King also admitted to biting Anna, although he gave no reason why he had done so, and he told Officer that he "wasn't sure how she would have obtained the black eyes" and bruises. Officer did not observe any apparent injuries on King's body.

¶5 At that point, after taking statements from Anna and King and assessing their respective injuries, Officer essentially ended his investigation. In particular, he did not check the bathroom or bedroom to see if there was any damage consistent with the particulars of their accounts. Nor did he check to see if Anna's phone was damaged, ask the neighbors if they heard yelling and screaming, or do more than just ask King if the house's indoor security cameras were functioning (King said they weren't).

¶6 The next day, the State charged King with one count of aggravated assault and one count of commission of domestic violence in the presence of a child, and a two-day jury trial was eventually held. The only witnesses to testify were Anna and Officer; Anna offered her version of events, as described above, and Officer testified about—among other things—his interview with King.

¶7     Anna was a loquacious witness who offered long answers to questions, sometimes providing information that was not directly sought. At one point, the prosecutor asked Anna to describe the injuries she had sustained during the incident. In response, Anna not only described the injuries but also volunteered that she had been "out of work for about a month-and-a-half to two months" and that even after she was able to return to work, she "could not work . . . properly or anything" because she "couldn't lift" and "couldn't load or anything," and as a consequence her supervisor assigned her to "the section where it's lighter work" and that she'd been "there ever since because of [her] back." King's attorney (Counsel) objected to this testimony as "irrelevant" and as "improper expert testimony." The court overruled the objection, but it did ask the State to just "move on." No further testimony on this topic was elicited.

¶8     At another point during Anna's testimony, the State asked her how she got to the police station the next morning, and she gave a lengthy answer:

> That morning, I texted my friend at work to tell her I was not going to come in, so she's not wondering where I am, or that—because we also work together, so she knows that I won't be around. I texted my supervisor and my manager, telling them I've been through domestic violence, so I will not get to work this week. So they don't think I'm ignoring or just calling in (unintelligible). I emailed my lawyer, and the picture I sent—I took a picture, and I sent him, telling him to help me out. And I wondered where to go and what to do. I did not want to go to the police station.

Counsel did not lodge any objection to either the State's question or to Anna's answer.

¶9 After Anna, Officer testified. He described his encounter with Anna at the police station and offered his observations of the severity of her injuries. He testified that Anna had told him that she and King "had been in an argument" and that King had been "yelling" at her. He stated that Anna's trial testimony—which Officer had just heard—was "fairly consistent with" what she "relayed" to him at the police station. And he offered his view that Anna's injuries, as he observed them, also appeared to be "consistent with" what Anna had "relayed" to him. Counsel did not lodge an objection to any of this testimony.

¶10 Instead, Counsel attempted to use some of this testimony to King's advantage during his cross-examination of Officer. Counsel asked Officer various questions designed to test whether he had done any further investigation regarding the consistency of Anna's various accounts of the incident or regarding the consistency of her statements with her injuries. In response to Counsel's questions, Officer acknowledged that he had not checked the rooms for damage, that he had not interviewed neighbors to see if they heard yelling, and that he had not inspected Anna's phone to see if it was broken. Officer also acknowledged that he had not investigated the particulars of certain "prior domestic violence cases where [Anna] had been arrested" as the aggressor. And when Counsel asked whether Officer had "just [taken Anna's] story, went over to interview [King], and then said, she has bruises, he doesn't," Officer answered, "Correct." Finally, Officer acknowledged that, after he arrested King, he commented to King that Anna's injuries were also "consistent with [King's] story."

¶11 After testimony ended, the court instructed the jury. One instruction stated that, for the jury to convict King of aggravated assault, it must find, among other things, either that (1) "King's conduct included the use of any act that interfered with the breathing or the circulation of blood of [Anna] . . . that was likely to produce a loss of consciousness," or (2) King used "other means

or force likely to produce death or serious bodily injury." And the jury was instructed that "[s]erious bodily injury means bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death."

¶12 At the conclusion of the trial, the jury found King guilty of both charges.

## ISSUES AND STANDARDS OF REVIEW

¶13 King now appeals his convictions, and he asks us to consider two issues. First, he challenges the trial court's decision to admit, over his objection, Anna's testimony about the effects of her injuries, and specifically that the injuries caused her to be put on a light-duty work assignment. "We review a court's decision to admit evidence for abuse of discretion." *State v. Lovell*, 2024 UT 25, ¶ 40.

¶14 Second, he makes various assertions that Counsel rendered constitutionally ineffective assistance. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257. With regard to some of his ineffective assistance claims, King seeks a remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, to enable him to supplement the record with evidence to support the claims. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Tuinman*, 2023 UT App 83, ¶ 53, 535 P.3d 362 (quotation simplified), *cert. denied*, 540 P.3d 79 (Utah 2023).

ANALYSIS

I. Evidentiary Ruling

¶15    King first asserts that the trial court abused its discretion by overruling his objection to Anna's testimony about the effects of her injuries, including specifically her testimony that the injuries caused her to be placed on a light-duty work assignment. King's objection to this testimony was twofold: first, he asserted that the testimony was not relevant, and second, he asserted that it constituted impermissible expert testimony. We address these issues, in turn, and conclude that the trial court did not abuse its discretion by overruling King's objection.

¶16    According to our rules, evidence is relevant, and therefore presumptively admissible, if (1) "it has any tendency to make a fact more or less probable than it would be without the evidence," and (2) "the fact is of consequence in determining the action." Utah R. Evid. 401; *see also State v. Ashby*, 2015 UT App 169, ¶ 24, 357 P.3d 554 ("Relevant evidence is presumptively admissible; irrelevant evidence is not." (quotation simplified)). These principles set "a very low bar" to admissibility "that deems even evidence with the slightest probative value relevant and presumptively admissible." *State v. Richardson*, 2013 UT 50, ¶ 24, 308 P.3d 526 (quotation simplified).

¶17    To prove that King committed the crime of aggravated assault, the State needed to prove both an assaultive act and a qualifying aggravating circumstance. *See* Utah Code § 76-5-103(1) (2018).[3] And to prove the aggravating circumstance, the State

_____

3. The aggravated assault statute was amended in 2022 and 2024, but because the acts in question here occurred in April 2019, we apply the law in effect at that time. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of

(continued…)

could take one of two available avenues. First, it could demonstrate that King "impede[d] the breathing or the circulation of blood of [Anna] by [King's] use of unlawful force or violence that is likely to produce a loss of consciousness." *Id.* § 76-5-103(1)(b)(ii). Alternatively, it could demonstrate that King used "other means or force likely to produce death or *serious bodily injury.*" *Id.* § 76-5-103(1)(b)(iii) (emphasis added). And "serious bodily injury" was statutorily defined as, among other things, "bodily injury that creates . . . protracted loss or impairment of the function of any bodily member or organ." *Id.* § 76-1-601(11). The instructions provided to the jury in this case—which are not challenged on appeal—included both of these avenues for proving the aggravating circumstance, as well as the definition of "serious bodily injury."

¶18 Given the statutory definition of the crime with which King was charged, the extent of Anna's injuries and the extent to which those injuries created "protracted loss or impairment" of her bodily functions was directly relevant information. King protests that, during closing argument, the State focused largely on the first avenue for demonstrating the aggravating circumstance—the strangulation—and not so much on the second avenue—serious bodily injury. But the jury was instructed on both avenues. Moreover, at the time King lodged his objection to Anna's testimony, it was not yet clear that the State would emphasize the strangulation avenue. Under these circumstances, Anna's testimony about the extent of her injuries and the manner in which those injuries had affected her ability to function was directly relevant, and it easily surmounts the "very low bar"

---

the event regulated by the law in question."). Neither party asks us to do otherwise, and neither party suggests that the outcome of this case turns on which version of the aggravated assault statute we apply.

imposed by our relevance rules. *See Richardson*, 2013 UT 50, ¶ 24 (quotation simplified).

¶19 The other focus of King's objection was his assertion that Anna's testimony about her injuries and her ability to function at work was impermissible expert testimony. But here, Anna's description of her own injuries was permissible lay testimony. Lay witnesses are permitted to offer opinions that are (1) "rationally based on the witness's perception"; (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and (3) "not based on scientific, technical, or other specialized knowledge." Utah R. Evid. 701. Anna's testimony meets all of these criteria.

¶20 The first two criteria are easily met here. First, Anna's testimony was based on her own perception of her injuries and their effects. She was testifying about things she personally observed and experienced. Second, the testimony was helpful (as noted above) to determining whether Anna had sustained a serious bodily injury.

¶21 The third criterion—whether Anna's testimony was "based on scientific, technical, or other specialized knowledge"—perhaps presents a closer question, because Anna's testimony included her opinion that the injuries she sustained at King's hands were what caused her to be placed on a light-duty assignment at work. King asserts that this testimony constitutes a "medical causation" opinion that may only be offered by a medical expert. But even here, we see no abuse of discretion in the trial court's decision to allow Anna to offer her view that these injuries resulted in the light-duty assignment. After all, Anna had been able to perform heavy-duty assignments before these injuries, she was not able to perform them after the injuries, and there had apparently been no other intervening cause that might explain the change. *Cf. Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 39, 493 P.3d 632 (stating that where "the treatment continues virtually

uninterrupted and there is no intervening cause that might suggest another reason for the treatment, it is in the jury's common knowledge that back injuries can cause pain that persists and requires continued treatment"). This sort of "causal connection is readily apparent using only common knowledge." *Id.* ¶ 31 (quotation simplified). Certainly, Anna's testimony might not have been sufficient to *prove* causation, *see id.*, but her testimony about her own perception of her injuries and of the injuries' apparent impact on her ability to perform her job duties is, under the circumstances, admissible lay testimony on the topic.

¶22 Accordingly, we discern no abuse of the trial court's discretion in its decision to overrule King's objection to Anna's testimony about the extent of her injuries.

## II. Ineffective Assistance of Counsel

¶23 Next, King asserts that Counsel rendered constitutionally ineffective assistance in several particulars. To succeed on a claim of ineffective assistance of counsel, King must make a two-part showing: (1) that Counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (quotation simplified).

¶24 To show that Counsel performed deficiently, King must demonstrate that Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of an attorney's actions, courts will often look to whether the actions the attorney took were motivated by trial strategy. *See id.* ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶25 Some of King's ineffective assistance arguments rest on evidence already in the record, while others depend on evidence not yet in the record and for which King asks us to remand the matter to the trial court. We assess each of King's arguments, in turn, and find each of them unpersuasive, because—for the reasons discussed below—King has not demonstrated that Counsel's performance was deficient in any way.

## A. Claims Based on Record Evidence

¶26 King makes two ineffective assistance claims that are grounded in evidence already in the record. First, he asserts that Counsel should have objected to statements Officer made about the "consistency" of Anna's trial testimony. And second, he asserts that Counsel should have raised hearsay-based objections to two pieces of testimony, one offered by Anna and one by Officer. We conclude, however, that Counsel did not perform deficiently by electing not to lodge the objections that King now asserts Counsel should have made.

1.      "Consistency" Statements

¶27    During trial, Officer testified that Anna's trial testimony was "fairly consistent with" what Anna had earlier "relayed" to him at the police station. In addition, he offered his view that Anna's injuries, as he observed them, also appeared to be "consistent with" what Anna had told him at the police station.

¶28    Even if we assume, for purposes of the discussion, that Counsel could have successfully objected to these statements, it does not follow that Counsel rendered ineffective assistance by electing not to do so. *See State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). As already noted, if Counsel's actions are explained by a reasonable strategy, then Counsel has not performed deficiently. *See Ray*, 2020 UT 12, ¶ 34. We agree with the State's assertion that the record here persuasively indicates that Counsel made a reasonable strategic decision to forgo any objection to this testimony and instead attempt to use it to King's advantage.

¶29    By allowing Officer's "consistency" statements to come in, and then attempting to point out that those statements were actually incorrect and unsupported by certain other evidence in the record, Counsel was attempting to argue—at the same time and using the same lines of questioning—both (a) that Officer's investigation was deficient and (b) that Officer's credibility was suspect. On cross-examination, Counsel asked Officer a number of questions designed to engender doubt about whether Officer had been sufficiently thorough in attempting to determine whether Anna's statements and injuries were consistent. In response to questioning, Officer acknowledged that he had not checked various household items for damage, that he had not interviewed neighbors to see if they heard yelling, and that he had not inspected Anna's phone to see if it was broken. Officer also

acknowledged that he had not investigated the particulars of certain "prior domestic violence cases where [Anna] had been arrested" as the aggressor. And when Counsel asked whether Officer had "just [taken Anna's] story, went over to interview [King], and then said, she has bruises, he doesn't," Officer answered, "Correct." Finally, Officer acknowledged that, after he arrested King, he commented to King that Anna's injuries were also "consistent with [King's] story."

¶30 It is perhaps true that not every attorney would have chosen this strategy. *See Strickland*, 466 U.S. at 689 (stating that "[t]here are countless ways to provide effective assistance" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way"). But Counsel did, and by doing so he was able to raise an inference that Officer short-circuited his investigation after interviewing the two principal witnesses, and he was also able to gain Officer's grudging concession that Anna's injuries could also have been consistent with King's version of events. In our view, this strategy was not unreasonable and is therefore not indicative of constitutionally deficient performance.

2. Hearsay Statements

¶31 Next, King asserts that Counsel rendered ineffective assistance by electing not to object to two "hearsay" statements, one offered by Anna and one offered by Officer.

¶32 While Anna was on the witness stand, the State asked her how she got to the police station the next morning, and she gave a lengthy and largely non-responsive answer, which included her statement that she had texted her supervisor that she wouldn't be at work "this week" because she had "been through domestic violence." Counsel lodged no objection to the State's question, perhaps because that question was entirely innocuous and non-objectionable and asked simply for information about how Anna

had transported herself to the police station on the morning after the incident. Indeed, King makes no argument, here on appeal, that Counsel should have objected to the State's question. And—presumably because Anna's statement about domestic violence was unsolicited and entirely unanticipated—King makes no argument that Counsel could have done anything ahead of time to prevent the statement from being uttered.

¶33    Instead, King asserts that Counsel should have objected to—or moved to strike—Anna's statement after it came in. But deciding whether to move to strike a statement after it has already come in is also an inherently strategic business. *Cf. Hart*, 2020 UT App 25, ¶ 29. There isn't much point in moving to strike a statement unless the motion also asks for a curative instruction telling the jury to disregard the statement. And such instructions invoke the pink-elephant paradox: by being told *not* to think about a thing, jurors may actually be more likely to think about that thing. *See State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("Indeed, a curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure."). In view of this reality, we have often held that decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess. *See, e.g.*, *State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony."). And this is especially true here, where the impact of the testimony—Anna describing her own belief that she had been subjected to domestic violence—was likely to be slight: the jury was already well aware, due to the fact that Anna drove herself to the police station to report the incident and that King was on trial for domestic violence, that Anna believed she was the victim of domestic violence. In this situation, we are simply not prepared to categorize the lack of an objection as unreasonable.

¶34 The second "hearsay" statement King identifies was offered by Officer. During his trial testimony, Officer testified that Anna had told him, at the police station, that she and King "had been in an argument" and that King had been "yelling" at her. But Counsel could reasonably have decided not to bother with an objection to this testimony, because it was undisputed that Anna and King had been in an argument and that the argument involved yelling. Anna had already testified to that effect. And Officer later testified that, during his interview of King on the day after the incident, King admitted that he and Anna had "been in an argument." Thus, there was little, if anything, to be gained by objecting to this testimony, and Counsel could reasonably have decided not to bother. *See State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314 ("[T]he law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury.").

¶35 Accordingly, we reject all of King's on-the-record claims of ineffective assistance, because we are unable to ascertain any deficient performance by Counsel regarding the issues raised.

### B. Rule 23B Remand

¶36 In addition to the on-the-record ineffective assistance claims King raises, he makes three other claims of ineffective assistance that are dependent upon evidence that is not already in the record. For these claims, King asks us to remand the case to the trial court for further proceedings in which he would be allowed the opportunity to supplement the record. *See* Utah R. App. P. 23B. We deny King's request for a remand, again on the basis that—even assuming that the evidence to which King points were in the record—King cannot demonstrate that Counsel performed deficiently.

¶37     Under rule 23B of the Utah Rules of Appellate Procedure, a defendant "may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." *Id.* R. 23B(a). "We apply a four-part test to evaluate rule 23B motions." *State v. Samora*, 2021 UT App 29, ¶ 50, 484 P.3d 1206 (quotation simplified), *aff'd*, 529 P.3d 330 (Utah 2023). First, the motion must allege facts not already in the record. *See State v. Griffin*, 2015 UT 18, ¶ 18, 441 P.3d 1166. Second, those factual allegations must not be speculative. *Id.* ¶ 19. Third, the allegations must demonstrate that counsel performed deficiently, and fourth, they must show that counsel's deficient performance prejudiced the defendant. *See Samora*, 2021 UT App 29, ¶ 50.

¶38     King's first rule 23B argument is that Counsel was ineffective for electing not to introduce more specific evidence of the earlier altercations between King and Anna. During cross-examination of Officer, Counsel did bring up the earlier encounters, and he even got Officer to acknowledge that he had not investigated certain earlier "domestic violence cases where [Anna] had been arrested" as the aggressor. But Counsel did not introduce any additional detail about these incidents, a decision that King now claims was deficient. After examining the additional evidence King asserts Counsel should have introduced, we conclude that Counsel had solid strategic reasons for not attempting to introduce it.

¶39     To be sure, the evidence of the encounters includes some details helpful to King, such as the fact that Anna had physically struck King and, on two of the several occasions, police arrested *Anna* as the aggressor. But as already noted, Counsel had already brought to the jury's attention the fact that Anna had been deemed the aggressor on some of the earlier occasions. The remaining details were, at best, a plus/minus for King, because they included allegations that King had, on previous occasions, admitted to not only physically assaulting Anna, but also to

calling her incredibly offensive names that we elect not to repeat in this opinion. In short, our review of the proffered detail from the earlier encounters is that reasonable counsel could very well have determined not to put that evidence in front of the jury.

¶40    King's second rule 23B argument is that Counsel should have called King's health-care provider to testify that King has "a severe lung condition" that has resulted in him having "half the lung function he should for his current age," and that he "would not be able to tolerate a prolonged period of vigorous activity." King asserts that his reduced lung function is relevant here because his condition rendered it "impossible for [him] to have been physically capable of completing the actions" that Anna claimed he completed, including beating her to the point of causing severe bruising. But King admitted to many of the assaultive acts: he told Officer that he twice grabbed Anna around the throat in a purposeful effort "to get her to pass out" and to "push her into the bathroom." He also admitted to biting Anna. Moreover, it was undisputed that Anna had extensive injuries, and King offered no alternative explanation as to how she might have obtained the black eyes and the bruises. Thus, King's primary defense at trial wasn't that he couldn't have committed the actions but, instead, that he had taken the actions in self-defense. Even after reading King's briefing on the point, we are unclear how the health-care provider's testimony about King's reduced lung function would have helped further King's defenses at trial. We therefore conclude that Counsel could reasonably have determined not to call the health-care provider.

¶41    Finally, King argues that Counsel should have introduced into evidence part of Officer's body camera video footage. This video clip shows a conversation between two police officers that took place after they interviewed King and decided to arrest him. One of the officers says either "end of video" or "end the video." The officer then comments, to the other officer, as follows: "I think you probably could have turned that right around on him." King

interprets this video as exhibiting "police bias against" him in the form of a "desire to turn things around on" him. The State espouses an entirely different—and much more benign—interpretation of the video clip: in the State's view, the statements in the clip simply represent one officer giving post-event constructive criticism to another officer about his interview technique. We have watched the video clip ourselves, and it appears to us that the State's interpretation is the better one. At a minimum, we conclude that Counsel could reasonably have decided not to use this particular video clip to mount a police-bias argument against Officer.

¶42   Accordingly, we deny King's request for a rule 23B remand because—even assuming that the proffered evidence were part of the record—King has not demonstrated that Counsel performed deficiently.[4]

CONCLUSION

¶43   The trial court did not abuse its discretion in overruling King's objection to Anna's testimony about the extent of her injuries. And King has not demonstrated that Counsel performed deficiently on any of his claims of ineffective assistance. Accordingly, we deny King's rule 23B request for a remand and affirm King's convictions.

_____

4. King also raises a cumulative error argument. But because we have not identified any errors, King cannot succeed in making a cumulative error argument. *See State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 ("Because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case." (quotation simplified)).