**2026 UT App 81**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUSTIN TIMOTHY WHITEFEATHER,
Appellant.

Opinion
No. 20240247-CA
Filed May 21, 2026

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 221100024

Ramon Ortiz, Debra M. Nelson, Benjamin Miller, and
Wendy M. Brown, Attorneys for Appellant

Derek E. Brown and Connor Nelson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

HARRIS, Judge:

¶1 A jury convicted Justin Timothy Whitefeather of forcible sexual abuse, a second-degree felony. Whitefeather now appeals his conviction, arguing that the trial court erred in several respects, including by allowing the State to amend the information during trial, refusing to strike a juror for cause, and overruling his objection to certain testimony. Whitefeather also asserts that his trial attorneys (Counsel) rendered ineffective assistance by not objecting to several other parts of various witnesses' testimony. For the reasons that follow, we reject Whitefeather's appellate arguments and affirm his conviction.

BACKGROUND[1]

*The Incident*

¶2      Whitefeather had recently reconnected with an old friend. This friend introduced Whitefeather to his girlfriend, Sydney.[2] Later, Sydney and the friend (Boyfriend) invited Whitefeather to go out "for his birthday" and to stay over at their house that night. Whitefeather accepted.

¶3      On the appointed day, Whitefeather arrived at the house, where Sydney and Boyfriend gave him a "house tour." The couple showed him the bedroom in which he would be staying, which was down the hall from their own bedroom. That evening, they met up with "quite a few people" at a local bar, where they drank, played pool, sang karaoke, and had "a good time." Throughout the night, Whitefeather "kept making jokes about being a trained killer," and he mentioned "how he had been shot before." By Sydney's own account, she had "more than five" but "[l]ess than 20" drinks, and she "left the bar before anyone else" because she "had to work the next morning." She "got a ride home," "went upstairs to [her] room and went straight to bed," wearing her "normal[]" "shirt and underwear."

¶4      Later that night, Sydney "woke up to . . . someone rubbing [her] vagina" "over [her] underwear." She did not feel "intoxicated at that time." The "only person" she thought it could

_____

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

2. A pseudonym.

be was Boyfriend, but when she opened her eyes, she saw that it was Whitefeather. She "closed [her] eyes" and "kicked [her] legs, hoping he'd leave." Whitefeather left, but he came back soon after. Sydney "opened [her] eyes" to see Whitefeather come "into [her] room again," but she "closed them again," pretending to be asleep and "hoping that he would just leave." This time, Whitefeather "tried to talk to [her] to see if [she] was awake." And "when [she] didn't respond, he said, 'Fuck it. She's out,'" and then he left. After Whitefeather left the second time, Sydney called a friend (Friend) who she knew was also at the house at that time, and he came and sat by the "side of [her] bed." Sydney told Friend that she had been "touched inappropriate[ly]" and "that [she] needed to leave," but when she heard "someone coming up the stairs," she told Friend "not to say anything" and she again pretended to be asleep. Whitefeather "opened the door for the third time," and Friend said to Whitefeather, "Shh. She's sleeping." Whitefeather called Friend a "creep" for "just sitting there watching her sleep" and then left the room. After that, Friend helped Sydney "pack a bag," and they left the house.

¶5 Friend called a coworker and mutual friend (Coworker), who said Sydney could come stay with her in her apartment. On the way there, Sydney began to "fog out" due to the traumatic experience, meaning she was unable to remember specific "conversations and details" about what happened after she left the house. She remembers "being hysterical, and not knowing what to do, because [she] didn't want to tell everyone" and because she "didn't know what would happen to [her] or to [Boyfriend] or [her] friends if [she] told them what [Whitefeather] did to [her]." According to Friend, when they got to Coworker's apartment, Sydney seemed "[s]cared [and] shocked," so he tried to hug Sydney "to comfort her," but "she wouldn't let [him] get near her," which was not "typical for her" because "[s]he was usually a pretty huggy person." According to Coworker, when Sydney got there, she "seemed very frantic, and she was almost

hysterical. She would sit down for a minute, and then she would get back up and walk around." She also "couldn't form sentences" and "didn't really want to talk about anything." Coworker testified that she had seen Sydney intoxicated before and that this was not how Sydney acted after she had been drinking. Friend left Sydney with Coworker at Coworker's apartment, where Sydney spent the rest of the night.

¶6 Sydney later told Boyfriend about the incident, and they "got into an argument" about when or if they should report it to the police due to fear of retaliation from Whitefeather. Sydney eventually reported the incident to the police four days after it occurred, and an officer (Officer) interviewed her.

*The Charging Document*

¶7 Later, the State charged Whitefeather with forcible sexual abuse, a second-degree felony, in violation of Utah Code section 76-5-404.[3] In the information, the State described the crime as having occurred when Whitefeather touched "any part of the genitals of an individual 14 years of age or older with intent to cause substantial emotional or bodily pain to any person, regardless of the sex of any participant." In the probable cause statement contained in the information, the State alleged that Whitefeather, "while visiting as a guest at [Sydney's] residence, entered [Sydney's] bedroom while she was sleeping and touched her genitals over her clothing."

---

3. The State initially charged Whitefeather with sexual battery, a class A misdemeanor, but amended the charge to forcible sexual abuse well before trial. Whitefeather does not challenge the propriety of this pretrial amendment to the charging document.

*Pre-Trial Procedure*

¶8 Whitefeather waived his right to a preliminary hearing, and the case proceeded toward trial. Some ten months in advance of the eventual trial date, both sides submitted proposed jury instructions. Notably, both the State's and Whitefeather's proposed instructions included two different pathways by which the State could prove the intent element of forcible sexual abuse. Specifically, the instructions indicated that the State could meet the intent requirement by showing that Whitefeather intended to either (a) cause Sydney "substantial emotional or bodily pain" (the method specified in the information) or (b) "arouse or gratify the sexual desire of any person." A few days before trial, the court asked if there were "any objections to the [jury] instructions," and both parties responded in the negative.

¶9 During the jury selection process, the trial court permitted both sides to ask jurors certain questions about themselves as well as questions about responses the jurors had given on a questionnaire. The court also gave both sides five total peremptory challenges, in addition to challenges for cause. In response to questions, Juror 16 disclosed that she "had a cousin that [had] worked with [the] County Sheriff, but she recently changed" jobs, and that she had another "cousin that works at the courthouse." When asked about how often she visited with those cousins, Juror 16 responded, "[N]ot so much because they moved." The court then asked Juror 16 if "[a]nything in those relationships . . . would cause [her] to favor or disfavor one side over the other side," and she responded in the negative. Neither the prosecutor nor Counsel asked Juror 16 any follow-up questions about these relationships, and neither attorney sought to remove Juror 16 for cause or by peremptory challenge. Juror 16 served on the jury.

¶10 Juror 23 disclosed that his two daughters had been "molested by their uncle." The court asked if "that experience

would cause [him] to favor or disfavor one side over the other," and Juror 23 responded in the negative. The court also asked Juror 23 if he "would be able to put that aside and make a fair and impartial decision based on what [he] hear[d] on this case and these facts," and Juror 23 responded in the affirmative. Juror 23 also stated that he could apply the law as instructed, that he could apply the presumption of innocence, and that past experiences with law enforcement would not influence him. At the conclusion of this colloquy, Counsel asked the court to strike Juror 23 for cause. The court denied the request because it "believe[d] that [Juror 23 was] able to indicate . . . fairly well that [his situation] would not impact" his ability "to be able to make a fair, impartial decision." Counsel used one of Whitefeather's peremptory challenges to strike Juror 23. Counsel did not seek the dismissal for cause of any other juror; thus, no juror who was challenged for cause ended up sitting on the jury.

*The Trial*

¶11 At trial, the State presented evidence from Sydney, Boyfriend, Friend, Coworker, and Officer, all of whom testified consistently with the events recounted above.

¶12 Sydney testified first, and when the State asked why she didn't report the incident with Whitefeather right away, she responded that she remembered Whitefeather calling himself a "trained killer" and that, consequently, she was afraid of "some sort of retaliation." On cross-examination, Counsel questioned Sydney about a discrepancy between her trial testimony and a statement she had earlier made to police. Sydney replied, "The first event, when I gave that statement, was recently after. I've been trying to cope and work through what has happened to me. And so it's very normal for my brain to block out—anyone's brain to block out traumatic things that have happened to you, and not remember everything." Counsel did not object to or probe into

this statement further. Following Sydney's testimony, the court excused the jury for the day.

¶13    The court then brought up, on its own, the discrepancy between the information—which mentioned only one intent pathway (an intent to cause substantial emotional or bodily pain)—and the jury instructions—which mentioned two intent pathways (adding an intent to arouse or gratify sexual desire). At that point, Counsel lodged an objection to the proposed jury instruction, describing the earlier submission of and agreement to it as an "oversight" and asking that the instruction be changed to "comport with" what was stated in the information. In response, the State asked the court to "stick with the instruction that both parties agreed to," and it further posited that it was "happy to file an amended information to make sure . . . the [i]nformation comports with what the instruction is."

¶14    Counsel objected to the State's proposal to amend the information, asserting that changing the information at that point "would be a due process violation." The State then acknowledged that there were "errors" in the information, but it pointed out that Utah's rules of criminal procedure allow a court to "permit an [i]nformation [to] be amended after the trial has commenced, but before verdict," so long as "no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." *See* Utah R. Crim. P. 4(d). The State argued that, given that both sides, long before trial, had submitted a proposed instruction containing *both* intent pathways, Counsel had "prepared for this trial in anticipation of the charge being due to the touching of [Sydney's] vagina for sexual gratification." The court eventually permitted the State to amend the information to add the sexual gratification intent pathway, because it found that doing so did not result in an "additional charge or offense being charged," and because it found that Whitefeather's "substantial rights [would not be] prejudiced by allowing the State to make that amendment."

¶15 The State then filed an amended information, charging Whitefeather with the same crime—forcible sexual abuse, a second-degree felony, in violation of Utah Code section 76-5-404—but now asserting that Whitefeather had acted "with the intent to arouse or gratify the sexual desires of any person." The probable cause allegation remained the same as in the previous information, accusing Whitefeather of "enter[ing] [Sydney's] bedroom while she was sleeping and touch[ing] her genitals over her clothing."

¶16 The next day, Boyfriend testified that, while they were on their way home from the bar, Whitefeather had "mention[ed] that . . . he was a trained killer." Counsel did not object. During cross-examination, Counsel followed up on the "trained killer" comment, asking Boyfriend if "it [was] possible that the trained killer comment might have been phrased another way," and Boyfriend acknowledged that as "a possibility." Boyfriend also admitted that Whitefeather had not made that comment to scare him; indeed, Boyfriend offered his view that Whitefeather "wasn't trying to intimidate" anyone by making that comment.

¶17 Officer testified next. On cross-examination, Counsel asked if, when Officer was interviewing Sydney, he was looking "for any verification details . . . to determine whether or not a particular story or version of events was true." Officer explained that intoxication "is taken into account" but that "it didn't appear that intoxication was a clear factor in [Sydney's] account." On redirect, the State asked Officer if Sydney told him "how much she had had to drink that night." Officer responded that Sydney had told him "she had five or six drinks" and that she had been "very specific" in indicating that she had consumed "10 ounces total." Counsel did not object to this part of Officer's testimony.

¶18 Finally, the State called Friend to testify. During direct examination, the State asked Friend to recount what Sydney had

told him happened to her on the night of the incident. Counsel objected on hearsay grounds, which objection the court initially sustained. At that point, a sidebar discussion was held, and the State argued that Sydney's statement was not hearsay because it wasn't being admitted for its truth but, instead, "to show why [Sydney] was so frantic to get out of the house, and why [Friend] understood the need to get her out of the house that night." The State further argued that even if the statement could be considered hearsay, it qualified for admission under one or more exceptions to the hearsay rule, such as the exceptions for excited utterances or present sense impressions. After the sidebar discussion, the court changed its mind and overruled the objection. Friend then responded to the question, testifying that Sydney told him that she had been "touched inappropriate[ly]."

¶19    In closing argument, the State heavily relied on Sydney's testimony. The prosecutor argued that Sydney was credible because she had a clear perception of what happened and had no reason to lie. During the defense closing, Counsel argued that Sydney's testimony was not credible because of her alcohol consumption and related mental state at the time of the incident and the lack of corroborating physical evidence. After deliberation, the jury convicted Whitefeather as charged.

ISSUES AND STANDARDS OF REVIEW

¶20    Whitefeather now appeals his conviction, and he asks us to consider three issues. First, he contends that the trial court erred by improperly allowing the State to amend the information during trial. As a general matter, we review for abuse of discretion a court's decision to permit amendment of an information during a trial. *State v. Williams*, 2025 UT App 118, ¶ 25, 576 P.3d 1142, *cert. denied*, 581 P.3d 554 (Utah 2025). But we review for correctness a court's interpretation of a procedural rule. *Drew v. Lee*, 2011 UT 15, ¶ 7, 250 P.3d 48.

¶21    Second, Whitefeather challenges the court's decision to deny his request to strike Juror 23 for cause. We will not reverse a trial court's decision not to excuse a prospective juror "absent an abuse of discretion." *State v. Taylor*, 2025 UT App 14, ¶ 15, 564 P.3d 962 (cleaned up). However, in this context, we "view the trial court's exercise of discretion in light of the fact that it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and selecting another." *Id.* (cleaned up).

¶22    Third, Whitefeather complains that some of the State's evidence was inadmissible. This issue has two components. First, he challenges the court's evidentiary ruling regarding Friend's testimonial recitation of what Sydney told him. "We review a trial court's evidentiary rulings for an abuse of discretion, and we will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Gollaher*, 2020 UT App 131, ¶ 21, 474 P.3d 1018 (cleaned up). Second, he asserts that Counsel rendered ineffective assistance by not objecting to three other instances of testimony. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (cleaned up).

ANALYSIS

I.  Midtrial Amendment of the Information

¶23    First, Whitefeather challenges the trial court's decision to allow the State to amend the information, during trial, to add the second (sexual gratification) intent pathway.[4] Both parties agree

---

4. In addition to contesting Whitefeather's argument on its merits, the State also asserts that, because Whitefeather did not request a

(continued…)

that this question is controlled by rule 4(d) of the Utah Rules of Criminal Procedure. That rule allows a court to "permit an information to be amended after the trial has commenced but before verdict if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." Utah R. Crim. P. 4(d). Whitefeather focuses his argument on the second part of this test,[5] asserting that the amendment adversely affected his substantial rights. We find this argument unpersuasive.

---

continuance, his challenge to the State's request to amend the information was not properly preserved for our review. But because we can resolve this issue on the merits in the State's favor, we opt to take that route here. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

5. In his opening brief, Whitefeather also argued that the first part of the rule 4(d) test—that the amendment must allege "no additional or different offense"—was not met. Utah R. Crim. P. 4(d). Specifically, citing language from *Tillman v. Cook*, 855 P.2d 211 (Utah 1993), he argued that the "different offense" question "turns on whether different elements are required to prove the offense charged in the amended information." *Id.* at 215. He then asserted that, because the amended information used a different intent pathway, it required different elements to be proven. In response, the State argued that *Tillman*'s statements on this point were merely dicta, and it asserted that the point was instead controlled by the court's holding in *State v. Peterson*, 681 P.2d 1210 (Utah 1984). In that case, our supreme court held that, as long as the same criminal statute was invoked and the same crime charged, a midtrial amendment did not allege an additional or different offense even where it invoked a different subsection of

(continued…)

¶24 The second part of rule 4(d)'s test asks whether "the substantial rights of the defendant" would be "prejudiced" by the amendment in question. *See id.* In this vein, we have stated that "even if an amended information does create a new and additional offense, reversal is only appropriate if the defendant can demonstrate that his or her substantial rights are prejudiced as a result of the amendment." *State v. Hattrich*, 2013 UT App 177, ¶ 39, 317 P.3d 433.

¶25 Here, Whitefeather asserts that the amendment prejudiced him, and he claims that his defense "was based entirely on the information that existed at the start of trial." The State disagrees, arguing that the facts of the case "obviously suggested an intent for sexual gratification," and pointing out that Whitefeather—based on the jury instructions he himself submitted prior to trial—was on notice that the State intended to argue that Whitefeather had acted with an intent to arouse or gratify sexual desire. The trial court ruled that the amendment would not impair Whitefeather's substantial rights, and we discern no abuse of discretion in that conclusion.

¶26 For starters, we agree with the State that the facts of the case point strongly toward sexual gratification being the alleged motive. Whitefeather was accused, in the previous information's probable cause statement, of "enter[ing] [Sydney's] bedroom while she was sleeping and touch[ing] her genitals." This accusation implies that Whitefeather did so for purposes of sexual gratification. And Whitefeather clearly understood this, as

that same statute. *See id.* at 1220–21 (noting that the amendment "did not change the basic charge" and used the same statutory "Title and Section" as the original information). By way of reply to the State's argument, Whitefeather conceded the point, acknowledging that "the same offense was alleged in both informations." In light of Whitefeather's concession, we need not further discuss the first element of the rule 4(d) test.

evidenced by the fact that, some ten months in advance of the eventual trial date, he and the State both submitted proposed jury instructions that included the sexual-gratification intent pathway. While Counsel later argued that Whitefeather's submission of and stipulation to such instructions had been a mistake, it is incontrovertible that Whitefeather was on notice of the sexual gratification intent pathway and had every opportunity to prepare to defend against that accusation at trial.

¶27   In addition, it is worth noting that Counsel's primary defense was available under either intent pathway. *See State v. Holt*, 2004 UT App 213U, para. 9 (concluding that the defendant had not "suffer[ed] any harm or prejudice as a result" of an amendment to the information, because "[t]he defense that he raised was available regardless of whether he was charged with aggravated sexual abuse of a child or forcible sexual abuse"). Counsel's primary defense—articulated in more or less the same way during both opening statement and closing argument, that is, both before and after the amendment to the information—was that the alleged abuse never occurred, that Sydney's testimony was not credible, and that the State failed to present enough evidence to support the charge. This defense works just as well against a sexual-gratification intent accusation as it does against a bodily-pain intent accusation. In this situation, it is difficult to see how Whitefeather's substantial rights could have been prejudiced by the amendment.

¶28   For these reasons, we discern no error in the trial court's decision to allow the State to make the requested midtrial amendment to the information.

## II.  Juror 23

¶29   Second, Whitefeather challenges the trial court's decision to deny his request to strike Juror 23 for cause. In response, the State argues that Whitefeather failed to preserve this claim and—

alternatively—that even if the claim was preserved, it fails on its merits. We agree with the State on both counts.

¶30  Under current Utah law, "parties need not use all of their challenges on jurors who were previously challenged for cause in order to preserve the issue of jury bias for appeal." *Turner v. University of Utah Hosps. & Clinics*, 2013 UT 52, ¶ 32, 310 P.3d 1212. "Rather, as long as (a) all of the party's peremptory challenges were used and (b) a juror who was previously challenged for cause ends up being seated on the jury, the issue of jury bias has been preserved." *Id.*[6] Here, Whitefeather meets the first part of this test—he used all of his peremptory challenges—but he cannot meet the second, because no juror that was challenged for cause ended up being seated on the jury. The only juror that Whitefeather challenged for cause was Juror 23, who did not end up sitting on the jury because Whitefeather used a peremptory challenge to strike him. Accordingly, under *Turner*, Whitefeather has not taken the steps necessary to preserve his jury bias challenge for appellate review.

¶31  But in any event, Whitefeather's claim would fail on its merits even if it were somehow preserved. Juror 23 repeatedly affirmed that, despite his daughters' abuse at the hands of their uncle, he would still be able to put that aside and render a fair and impartial decision based on the facts presented. Juror 23 also stated that he could apply the law as instructed, that he could apply the presumption of innocence, and that past experiences

---

6. Whitefeather argues that the standard set forth in *Turner v. University of Utah Hospitals & Clinics*, 2013 UT 52, 310 P.3d 1212, leads to "an illogical result," and he contends that the *Turner* "standard should be abandoned." But we have no authority to consider this argument; we must apply *Turner* as written. *See Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18 ("We are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (cleaned up)).

with law enforcement would not influence him. Unlike the juror in the recent case of *State v. Bunton*, 2026 UT App 59, ¶ 7, who offered an unsolicited statement that he could not be fair and impartial, Juror 23 did not give any indication that his life experience would prevent him from adjudging the facts fairly. Under these circumstances, the trial court did not abuse its discretion in denying Whitefeather's for-cause challenge.[7]

¶32    For any and all of these reasons, then, Whitefeather's challenge to the composition of the jury fails.

### III. Evidentiary Issues

¶33    Third, Whitefeather complains that four pieces of testimony that the State used to argue for conviction were inadmissible. One of these challenges involves a preserved claim,

---

7. Moreover, Whitefeather has not demonstrated that any prejudice resulted to him from that decision. Under *Turner*, to prove prejudice on a jury bias claim, Whitefeather must show "that (a) a juror who was previously challenged for cause sat on the jury, and (b) that juror was, in fact, biased." 2013 UT 52, ¶ 29. As already noted, Whitefeather cannot meet the first element, because no juror who was previously challenged for cause ended up sitting on the jury. Whitefeather points to Juror 16, but he didn't ask for Juror 16 to be dismissed for cause. And even on appeal, he doesn't argue that Counsel's decision not to lodge a for-cause objection to Juror 16 was ineffective assistance. Such an argument would be tough sledding: as Juror 23 did, Juror 16 told the court that she could be fair and impartial despite the issues being discussed. And it should go without saying that simply having a cousin—even two cousins—in law enforcement does not, without much more, disqualify a juror from service. And here, Juror 16 indicated that her relationships with the cousins in question were not particularly close ones. On this record, there is simply insufficient indication that Juror 16 was actually biased.

and the other three involve an assertion that Counsel rendered ineffective assistance. We discuss each challenge, in turn, and conclude that none of them have merit.

## A.     The Preserved Claim Regarding Friend's Testimony

¶34     Whitefeather first contends that the trial court erred in allowing Friend to testify that Sydney told him that she had been "touched inappropriate[ly]." Whitefeather asserts that this statement constituted inadmissible hearsay. In response, the State counters that Friend's testimony was not hearsay at all or, if it was, it fell into an exception. We agree with the State that Friend's statement did not constitute hearsay.

¶35     Hearsay is defined as an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement," and hearsay statements are generally not admissible. Utah R. Evid. 801(c)(2), 802. But where "an out of court statement is offered for some other purpose—e.g., to show its effect on the hearer's state of mind and not for its truth—it is not hearsay." *Arnold v. Grigsby*, 2018 UT 14, ¶ 20, 417 P.3d 606 (cleaned up); *see also State v. Huey*, 2022 UT App 94, ¶¶ 49–50, 516 P.3d 345 (holding that a mother's testimony that an officer called and told her that her daughter had been raped was not hearsay because it was "not offered to prove the truth of the matter asserted" but, instead, "was offered to lay the groundwork" for the mother's subsequent actions).

¶36     Here, the State argued that Friend's statement about Sydney having been "touched inappropriate[ly]" was not offered for its truth but, instead, was offered "to show why [Sydney] was so frantic to get out of the house, and why [Friend] understood the need to get her out of the house that night." After hearing this argument, the court overruled Whitefeather's objection, and we discern no abuse of discretion in that decision. Friend took action to help Sydney—he stayed with her and assisted her when

Whitefeather returned to the bedroom, and later he helped her get out of the house and relocate to Coworker's apartment. Friend's brief statement that he did these things because Sydney had told him that Whitefeather had touched her inappropriately was, in this situation, not hearsay because it was not offered for its truth but, instead, to explain why Friend would take such unusual actions on Sydney's behalf. On this basis, we reject Whitefeather's challenge to the trial court's decision to allow this testimony.

B.      The Ineffective Assistance of Counsel Claims

¶37    Whitefeather next argues that Counsel rendered ineffective assistance by not objecting to certain other testimony offered by various witnesses. A defendant seeking to show that his or her attorney rendered ineffective assistance must make a two-part showing: that (1) the attorney's performance was deficient and (2) this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The first part of this inquiry involves an assessment of the objective reasonableness of counsel's actions, *see State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350, and "requires [a] showing . . . that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland*, 466 U.S. at 687. The second part requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In this second inquiry, the crucial question is whether "the outcome of [the defendant's] case would have been different absent counsel's error." *Scott*, 2020 UT 13, ¶ 43.

¶38    Here, Whitefeather identifies three pieces of testimony that he believes should not have been admitted and to which he believes Counsel should have objected: (1) Officer's testimony about the amount of alcohol Sydney consumed on the evening in question; (2) Sydney's statements about the extent to which she

believes trauma can affect memory; and (3) statements from both Sydney and Boyfriend that Whitefeather had described himself as a "trained killer" on the evening in question. We address each of these issues in turn.

### 1.     Officer's Testimony Regarding Alcohol

¶39     Whitefeather first contends that Counsel rendered ineffective assistance by not objecting to Officer's testimony that Sydney told him "she had five or six drinks" and that she had been "very specific" in indicating that she had consumed "10 ounces total." Whitefeather argues that this testimony constituted inadmissible hearsay and that Counsel should have objected to it.

¶40     "In deciding whether to lodge objections, attorneys are entitled to pick their battles, and do not have a Sixth Amendment obligation to object to everything." *State v. Samora*, 2021 UT App 29, ¶ 44, 484 P.3d 1206 (cleaned up); *see also State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). "We must view a decision to not object in context and determine whether failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Samora*, 2021 UT App 29, ¶ 44 (cleaned up).

¶41     Even assuming, for purposes of the discussion only, that Officer's testimony on this topic was inadmissible hearsay, a competent attorney could have reasonably opted not to object to it. To be sure, Officer's testimony placed Sydney's alcohol consumption on the lower end of Sydney's own admitted range; during her trial testimony, she acknowledged that she had enjoyed "more than five" but "[l]ess than 20" drinks on the evening in question. But even so, Officer's testimony corroborated the fact that Sydney had consumed quite a bit of alcohol (ten ounces), and Counsel could have reasonably believed that

allowing Officer to offer this testimony supported Whitefeather's defense that Sydney was not in the right mental state to be able to accurately identify Whitefeather at the scene. In this situation, a decision not to object to Officer's testimony would not be unreasonable, and on that basis—lack of deficient performance—we reject Whitefeather's first claim of ineffective assistance.

2.      Sydney's Testimony Regarding Trauma

¶42    Next, Whitefeather argues that Counsel should have objected to Sydney's testimony about trauma and memory. At trial, Sydney testified that, in her view, it was "very normal" for the human "brain to block out traumatic things" that had happened and that this causes people who have experienced trauma to "not remember everything." Whitefeather contends that this constituted impermissible expert testimony because the topics of "memory formation" and "trauma responses" are not within the common knowledge of most laypersons.

¶43    But again, even if we assume—for purposes of the discussion—that this testimony was inadmissible, a competent attorney could have opted not to object to it. Any reasonable juror could have discerned that Sydney was not an expert in this field, so Counsel could have reasonably believed that Sydney offering testimony like this could have damaged her credibility, thus working in Whitefeather's favor rather than to his detriment. *See State v. Repsher*, 2025 UT App 50, ¶ 48, 568 P.3d 1095 (rejecting an ineffective assistance claim in a similar context and concluding that "a reasonable attorney might have thought the jury would find [the complaining witness's] armchair medical testimony" about the effects of trauma on memory to be "off-putting or unconvincing, thus rendering her other testimony less credible"). Additionally, "a reasonable attorney might have believed that it was to his [or her] client's benefit to allow the State's main witness to discuss the reasons why her memory appeared to be faulty, because such discussion draws additional attention to the fact that

the witness's memory is in fact faulty." *Id.* Thus, "there were strategic reasons why Counsel may have chosen to forgo an objection" to Sydney's "trauma testimony." *Id.*

¶44 Moreover, even if an objection had been lodged, Counsel could only have moved to strike the testimony and obtained a curative instruction. That is because Sydney's statement about trauma and memory was largely unresponsive to the questions put to her, providing Counsel no opportunity to object before the testimony was heard by the jury. The exchange occurred during Counsel's own cross-examination of Sydney, and Counsel was asking her about a discrepancy between her trial testimony and a statement she had earlier made to police. Without prompting, Sydney offered her thoughts about how she believed her traumatic experiences had affected her memory. Thus, the only remedy Counsel could have sought—even if Counsel believed that Sydney's trauma-related testimony was unhelpful—was to have the testimony stricken from the record and a curative instruction provided to the jury.

¶45 "[W]e have often held that decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess." *State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96; *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure."). In this case, a reasonable attorney could have strategically decided not to reemphasize the testimony relating to Sydney's purported trauma with a curative instruction. *See State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony.").

¶46 Accordingly, Whitefeather has not demonstrated that Counsel performed deficiently in reacting to Sydney's trauma-

related testimony, and on that basis we reject Whitefeather's second claim of ineffective assistance.

3.      Testimony About Whitefeather Being a "Trained Killer"

¶47     Finally, Whitefeather argues that Counsel should have objected to Sydney and Boyfriend testifying that Whitefeather had described himself as a "trained killer." He argues that this testimony was "unsubstantiated" and "highly inflammatory character evidence," and he asserts that it was inadmissible under rule 403 of the Utah Rules of Evidence. The State argues that Counsel did not perform deficiently by not objecting to this testimony, because any such objection would have been unlikely to succeed. We agree with the State.

¶48     Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." The "probative value of evidence is judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or less probable and the proponent's need for the evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 19, 482 P.3d 822 (cleaned up). This rule "imposes the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it *substantially* outweighs the probative value." *State v. Smith*, 2019 UT App 141, ¶ 35, 449 P.3d 971 (emphasis added) (cleaned up).

¶49     Here, Counsel could have reasonably thought that any objection to the "trained killer" testimony would have been overruled. After all, the testimony did have some probative value—it served to explain why Sydney had delayed her disclosure of the events in question—and a competent attorney could reasonably have believed that the trial court would be extremely unlikely to conclude that this probative value was *substantially* outweighed by the risk of unfair prejudice. Here, the risk of unfair prejudice was not particularly high, where

Boyfriend acknowledged that Whitefeather's statement was not meant to intimidate anyone and where the offense in question was not murder—the sort of crime a "trained killer" might commit—but was forcible sexual abuse. In this situation, Whitefeather has simply not demonstrated that Counsel's failure to object was unreasonable under the circumstances. *See State v. Jordan*, 2018 UT App 187, ¶ 50, 438 P.3d 862 ("The failure to raise futile objections does not constitute ineffective assistance of counsel." (cleaned up)).

## CONCLUSION

¶50    The trial court did not err in permitting the State to amend the information during trial. Whitefeather's jury bias arguments are unpreserved and fail on the merits anyway. And we reject each of Whitefeather's evidentiary challenges.

¶51    Affirmed.

―――――――